ESTATE OF DOROTHY J. WARREN, DECEASED, RIVER OAKS TRUST COMPANY AND R. CLAY UNDERWOOD, COADMINISTRATORS WITH WILL ANNEXED OF THE ESTATE OF DOROTHY J. WARREN, DECEASED, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 36285-87. Filed December 14, 1989.

*S. Stacy Eastland, Robert M. Weylandt,* and *Walter E. Workman,* for the petitioner.
*Rebecca W. Wolfe,* for the respondent.

SCOTT, *Judge:* Respondent determined a deficiency in the Federal estate tax of the Estate of Dorothy J. Warren in the amount of $34,340,734.68. Some of the issues raised by the pleadings have been disposed of by agreement of the parties, leaving for our decision whether all administration expenses incurred by the Estate of Dorothy J. Warren (petitioner or the estate) must be subtracted from residuary corpus, thereby reducing the estate's charitable annuity deduction under section 2055(e)(2)(B), even though a portion of such expenses may have been paid with post-mortem income.[1]

---

[1] All section references are to the Internal Revenue Code of 1954 as amended and in effect as of the date of the decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure.

## FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Dorothy J. Warren (decedent) died testate on May 27, 1983. At the time of her death, decedent was a resident of Dallas, Texas. The duly appointed Coadministrators With Will Annexed of decedent's estate are the River Oaks Trust Co. and R. Clay Underwood (Mr. Underwood). River Oaks Trust Co. (the Trust Co.) has its principal place of business in Houston, Texas. Mr. Underwood is a resident of, and conducts business in, Wichita Falls, Texas. On or about February 16, 1952, decedent married Jasper Newton Warren (Mr. Warren). During the course of their marriage, Mr. Warren, along with a man named Allan C. King (Mr. King), became involved in the oil and gas industry. Mr. Warren and Mr. King conducted their activities through numerous partnerships and closely held corporations (hereinafter collectively referred to as the Warren-King entities). At least a portion of their business involved the structuring of exploratory drilling programs in which investors would be asked to participate.

Mr. Warren and Mr. King were very successful during the 1970's. Mr. Warren acquired and indirectly held numerous interests in oil and gas producing properties through the Warren-King entities. These properties were located in Texas, Louisiana, and Colorado. However, beginning in 1981, the fortunes of the Warren-King entities, as well as the financial positions of Mr. Warren and Mr. King, declined sharply. Mr. Warren and Mr. King were forced to undertake or assume large amounts of debt. The First City National Bank of Houston (First City Bank), became a major creditor of the Warren-King entities.

This downturn eventually resulted in the dissolution and restructuring of the Warren-King entities on March 14, 1983. The purpose of the dissolution and restructuring agreement, which was undertaken at the insistence of certain lending institutions, was to eliminate the various tiers of partnerships which existed between the lenders and the individual investors in the Warren-King entities. The dissolution and restructuring agreement afforded the lending banks the opportunity to reach the individual mort-

gages and, therefore, the individual assets of Mr. Warren, Mr. King, and the other investors in the Warren-King entities, including Mrs. Warren.

At the time the dissolution and restructuring agreement was executed on March 14, 1983, decedent was incapacitated and could not communicate effectively. Therefore, the dissolution and restructuring agreement was executed on her behalf by her brother, D. E. Galland (Mr. Galland), acting under a power of attorney. In addition, several days after execution of the dissolution and restructuring agreement, First City Bank, Mr. Warren, Mr. King, and Mr. Galland, acting on behalf of the decedent, entered into a so-called "consolidated revolver loan," the purpose of which was to consolidate various oil and gas debts owed to First City Bank. In connection with this loan, Mr. Galland executed a document, on behalf of decedent, pledging most, if not all, of decedent's property to First City Bank.

During her lifetime, decedent was an active participant in the church activity of the Galveston-Houston Catholic Diocese of the Roman Catholic Churches in the United States (the Catholic Diocese). On or before August 13, 1979, decedent and Mr. Warren orally pledged $1 million (plus interest) towards the construction of a nursing home and chapel at the St. Dominic's Diocesan Center (St. Dominic's) which is located in Houston, Texas. Decedent and Mr. Warren later indicated their consent and agreement to such pledge by signing a letter, dated August 13, 1979, from Reverend Charles K. Schoppe, Director of St. Dominic's, which was addressed to the Most Reverend John L. Morkovsky, Bishop of the Catholic Diocese of Galveston-Houston. The letter requested permission to construct the St. Dominic Nursing Home and Chapel and explained the commitment undertaken by decedent and Mr. Warren. The chapel was subsequently designated the Warren Chapel.

On or about July 15, 1980, decedent and Mr. Warren were separated. On October 27, 1980, Mr. Warren filed suit for divorce against decedent. Decedent and Mr. Warren were divorced on June 14, 1982, after approximately 30 years of marriage.

On May 28, 1982, decedent and Mr. Warren entered into a marriage settlement agreement, with accompanying sched-

ules, under which decedent received, in addition to certain real estate, personal property, and marketable securities, an undivided 50-percent interest of the community estate's interest in the Warren-King oil and gas entities. Decedent also received undivided interests in certain community investments, savings and checking accounts, accounts receivable, and notes receivable. The aggregate value of the marital property awarded to decedent pursuant to the marriage settlement agreement was approximately $48 million.

Decedent agreed to assume any and all liabilities or encumbrances which were secured by the property and interests that she received. She also agreed to assume an undivided liability for certain loans, accounts payable, and notes payable. Finally, decedent assumed responsibility for half of the $1 million pledge to St. Dominic's Diocesan Center. The aggregate amount of marital debt assumed by decedent pursuant to the marriage settlement agreement was approximately $10 million.

As noted previously, decedent died testate on May 27, 1983. She was survived by four adult children (the Warren children) and an unspecified number of minor grandchildren. Decedent's Last Will and Testament (the will) was drafted by S. Stacy Eastland (Mr. Eastland) of the law firm of Baker & Botts. Mr. Eastland also represents the Trust Co. in this proceeding. Decedent executed her will on October 27, 1981.

In article I of her will, decedent appointed D. E. Galland, Michael Francis Galland, Harold Erbs, and the Trust Co. as independent coexecutors of her estate. The coexecutors so appointed were also named as co-trustees of certain testamentary trusts which were to be created under decedent's will. Decedent's will provided that the Trust Co. was to receive fair and reasonable compensation for services performed by it as coexecutor (not to exceed an amount computed by reference to the amount of hours spent in the performance of such services) and that the Trust Co. was to receive fair and reasonable compensation for services performed by it as cotrustee. The will also provided that none of the individual executors or trustees were to receive compensation for their services. Article II of the will further

provided that no bond or other security would be required of the executors or trustees. In article II of her will, decedent directed that the administration of her estate should be conducted independent of any court and that no action should be brought in any court other than to probate and record her will. Decedent conferred upon the executor of her will, in addition to all the powers conferred in the will or vested in an independent executor by law, "all the rights and powers conferred upon a trustee by the Texas Trust Act and other laws of Texas * * * ." The will also provided a non-exclusive list of powers with which the executor was endowed and transactions in which the executor was permitted to engage. Specifically, under article II of the will, the executor was authorized:

(i) To sell or lease or otherwise dispose of or encumber any property, whether or not necessary for payment of debts, expenses, or taxes;

(ii) To borrow money from any lender (including a fiduciary hereunder) for any purpose;

*       *       *       *       *       *       *

(vi) To make any election under any tax law in the manner Executor deems ans [sic] shall result in adjustments among beneficiaries of my estate or any trust; and

(vii) To join in or consent to any reorganization, merger, consolidation, dissolution, readjustment, exchange, or other transaction and to any related plan or action with respect to any stocks, securities or businesses in which I may own an interest.

Article III of decedent's will is entitled *"Debts, Expenses, and Taxes."* In article III, decedent directed that:

All of my just debts, funeral expense, administration and testamentary expenses, and all estate, inheritance, transfer, and succession taxes upon or with respect to any property required to be included in my gross estate under the provisions of any tax law, whether or not passing hereunder, shall be paid out of my residuary estate passing under Article V hereof, without apportionment. * * *

In article IV of decedent's will, she disposed of her personal property and effects (motor vehicles, boats, clothing, jewelry, household furnishings, etc.) and made certain specific and general bequests. For example, article IV provided for a $100,000 gift to an employee of decedent. Under article IV, decedent placed $1 million in trust for the benefit of her parents.

Article V of the will is entitled *"Residuary Gift."* Pertinent portions of article V of decedent's will are excerpted in Appendix A. In article V, decedent provided for the establishment of two charitable annuity trusts, the Dorothy J. Warren Charitable Lead Children's Trust and the Dorothy J. Warren Charitable Lead Grandchildren's Trust, out of the residue of decedent's estate. The Catholic Diocese and St. Dominic's (collectively referred to as the charitable beneficiaries) were named as equal beneficiaries under both such trusts. Both such charitable beneficiaries were qualified charitable organizations at the date of decedent's death. The interests of the charitable beneficiaries in the trusts created under the will are guaranteed annuities under section 2055(e)(2)(B).

The period of the annuity under each trust was 20 years, beginning on decedent's date of death and ending 20 years from such date of death. The trustee of each trust was instructed to pay to the charitable beneficiaries, in equal shares, an amount equal to 8 1/2 percent of the initial net fair market of the assets with which the trusts were to be funded (the annuity amount). Each trust was to be funded with one-half of decedent's residuary estate. According to the will, decedent's residuary estate was intended to consist of her entire testamentary estate after satisfaction of any gifts under article IV of the will and after payment of the debts, expenses, and taxes referred to in article V of the will. The trustee was further instructed to pay the annuity amount, at the end of each taxable year of the trust, from the annual income of the trust, if such income was sufficient, and from the principal of the trust, to the extent it was not. Any trust income in excess of the annuity amount was to be added to principal of the trust.

Upon the expiration of the annuity period, the trustee was to distribute all trust properties of the Dorothy J. Warren Charitable Lead Children's Trust free of trust to decedent's children then living per stirpes. However, the will provided that if any of decedent's children had not attained the age of 35 by the time the annuity period expired, only a portion of the trust properties would be distributed to such child. The remainder of that child's

portion of the trust properties would pass to a separate trust for the benefit of such child.

Decedent's will further provided that, upon the expiration of the annuity period, the trust properties of the Dorothy J. Warren Charitable Lead Grandchildren's Trust were to be distributed free of trust to the decedent's grandchildren then living per stirpes. However, the will provided that, if any of the decedent's grandchildren had not attained the age of 35 by the expiration of the annuity period, such grandchild's proportional share of the trust properties would pass into a separate trust for the benefit of such grandchild. The will also made provision for grandchildren who were born or adopted after expiration of the annuity period.

On or about June 15, 1983, the decedent's family consulted with the trust company concerning the administration of her estate. The family claimed that decedent was heavily indebted to various creditors of the Warren-King entities, that the estate was being pressured by these creditors to execute various notes and guarantees, and that, if these notes and guarantees were not executed immediately, the estate would likely be left with no assets. After a cursory review, the Trust Co. came to the conclusion that many of the alleged debts were not, after all, debts of the decedent and that, in order to conserve the assets of the estate and sort out the legitimate debts from the illegitimate debts, a dependent administration of the estate was necessary. Consequently, the Trust Co. declined to serve as an independent executor of the estate. Furthermore, each of the individual executors named by decedent in her will also declined to serve as such and, therefore, Letters Testamentary were not issued.

On September 26, 1983, decedent's will was admitted to probate in Probate Court No. 3 of Dallas County, Texas (the Probate Court). The Probate Court appointed R. Clay Underwood and the Trust Co. as Coadministrators With Will Annexed (coadministrators) of decedent's estate. Thus, a dependent administration of decedent's estate in the State of Texas was initiated on September 26, 1983. Mr. Charles L. Ehrhardt, III, (Mr. Ehrhardt) represented the Trust Co. in its capacity as coadministrator of decedent's estate.

The Trust Co. subsequently determined that, as a consequence of the dissolution and restructuring of the Warren-King entities, decedent owned direct interests in real property located in the State of Louisiana. Therefore, an ancillary administration of decedent's estate was eventually initiated in Louisiana. R. Clay Underwood and Hibernia National Bank were appointed coexecutors of decedent's estate in Louisiana. In addition, an ancillary administration was initiated in the State of Colorado.

During, and prior to, the administration of the estate, decedent's four adult children have been represented by Mr. Alan Leibel (Mr. Leibel) of the law firm of Brice & Mankoff (or its predecessor firm Brice & Baron) in connection with the estate. On January 31, 1984, Mark S. Michael was appointed as Guardian and Attorney Ad Litem to represent the interests of the grandchildren, unborn grandchildren, unborn great-grandchildren, and unknown heirs of the decedent in connection with the estate. During, and prior to, the administration of the estate, the charitable beneficiaries have been represented by Mr. Rodney C. Koenig (Mr. Koenig) of the law firm of Fulbright and Jaworski in connection with the estate. First City Bank has been represented by the law firm of Vinson & Elkins.

After decedent's death, numerous claims were filed against the estate by creditors of the Warren-King entities. On December 15, 1983, the charitable beneficiaries filed a claim in the amount of $376,750 (plus interest) against the estate seeking enforcement of decedent's pledge to support the construction of the St. Dominic's Nursing Home and Chapel.[2] Although the coadministrators initially denied the claim, the parties eventually agreed that the estate would pay $310,000 in full satisfaction of the pledge claim and judgment was entered accordingly on September 26, 1985. Payment of this amount was to be deferred until resolution of a suit filed against the estate by its alleged creditors. In addition, the parties agreed that the residuary estate was not to be reduced by the settled amount for purposes of calculating the annuity amount due the charitable beneficia-

---

[2]The amount claimed represents the unpaid portion of decedent's half of the $1 million pledge undertaken by decedent and Mr. Warren.

ries under the will and that the first installment of such charitable annuity would be reduced by the settled amount.

On October 24, 1984, the charitable beneficiaries filed a petition for declaratory judgment in the probate court in Cause No. 83-2091-P3(H) (the H lawsuit). Respondent was not made a party to the H lawsuit. In the H lawsuit, the charitable beneficiaries asked the Probate Court to construe certain provisions of the will. Specifically, the charitable beneficiaries alleged that:

> There is an ambiguity under the Charitable Annuity Calculation Sections as to whether the total value of the residue of the estate should be reduced by all of the administration expenses, debts and other expenses incurred and to be incurred in connection with this estate for purposes of calculation of the charitable Annuity Amount. It is unclear as to whether the gross estate for determining the annuity amount should be reduced by all debts and expenses or only those debts and expenses properly allocable to principal under the laws governing the allocation of expenditures between income and principal under the laws of the State of Texas.

The charitable beneficiaries pointed out that, under article II of the will, the executors of the estate would have all the powers conferred upon a trustee under the Texas Trust Act (now the Texas Trust Code) and that, under the Texas Trust Code, a trustee is empowered to allocate certain expenses to income and certain other expenses to principal.

In connection with the H lawsuit, the charitable beneficiaries posed certain questions to the coadministrators in the form of interrogatories. In answer to these interrogatories, the coadministrators pointed out that, under article V of the will, decedent's residuary estate, on which the annuity amount was to be calculated, was intended to consist of decedent's entire testamentary estate after satisfaction of any gifts under article IV and payment of debts, expenses, and taxes under article III. The coadministrators also answered "No," to the question, "Do you contend that any provision of the Will is ambiguous or unclear as to the Decedent's intent?"

In the H lawsuit, the charitable beneficiaries further alleged that it was unclear as to whether, as a result of the dissolution and restructuring of the Warren-King entities, decedent owned immovable interests in certain Louisiana oil

and gas properties or whether she continued to own indirect interests in such properties through certain Texas partnerships. The charitable beneficiaries asked the Probate Court to determine: (1) What law is to be applied in determining whether decedent's interests in Louisiana oil and gas properties are immovable or personal property partnership interests; (2) whether the Texas partnerships were properly dissolved at the time of decedent's death; and (3) whether there was a need for an ancillary administration in Louisiana. The charitable beneficiaries also asked the Probate Court to determine whether certain other provisions of decedent's will, which are not relevant to the present case, rendered the will invalid under Louisiana law. Finally, the charitable beneficiaries requested that the Probate Court reform and modify subsection (iv) of article II of decedent's will to correct a typographical error appearing therein.

During the period beginning on April 24, 1983 and ending on December 4, 1987, the coadministrators of decedent's estate filed eight separate petitions in the Probate Court against various entities, creditors, and individuals, including Mr. King, Mr. Warren, certain Warren-King entities, and decedent's four children. In addition to other forms of relief, the coadministrators requested that the Probate Court determine the ownership interests of the estate and other concerned parties in various Warren-King entities. The coadministrators also requested that the Probate Court order accountings from various Warren-King entities. Finally, the coadministrators sought damages in connection with certain amounts which were improperly transferred to alleged creditors of the decedent.

On August 29, 1984, petitioner filed a United States Estate Tax Return (Form 706) with the District Director of Internal Revenue at Dallas, Texas. On August 30, 1984, the Probate Court entered an Order Regarding Federal Estate Tax Return which authorized the filing of a United States Estate Tax Return. The Form 706 filed by the estate contained insufficient information from which the estate tax liability could be determined. The Form 706 contained no entries for total gross estate, total allowable deductions, taxable estate, gross estate tax, net estate tax, etc. Rather, such amounts were stated to be "undetermined" or were

left blank. No amount of estate tax was remitted with the Form 706.

At various times during the administration of the estate, it was not clear whether the estate was solvent due, principally, to the assertion by alleged creditors of the estate of over $90 million in claims. Although many of these claims eventually turned out to be groundless, the estate incurred substantial costs in defending against them. The charitable beneficiaries maintained that the value of the residue of the estate was greater than $20 million while the Warren children claimed that the value of such residue was between $8 million and $12 million.

The estate also incurred substantial administration expenses because of its ownership of oil and gas properties, the inability of the coadministrators to obtain vital information relating to such oil and gas properties, the financial difficulty of the operator of the oil and gas properties, the inability of the administrators to obtain possession of the assets of the estate, and the dependent administration of the estate. Mr. Ehrhardt worked virtually full-time on the administration of the estate from shortly after the decedent's death in 1983 until 1987. A total of 16 suits were eventually filed as a result of the alleged debts of the decedent, in an attempt to determine what assets were owned by decedent, or in an attempt to recover or protect the assets of the estate. Many of the suits involved multiple claims and counterclaims.

After extensive discovery efforts and protracted negotiations, a settlement was proposed by certain parties to the suits affecting the estate. On June 16, 1987, an order authorizing settlement of claims by and against the estate (the authorization order) was entered by the probate court. According to the authorization order, the settlement was to be by and among 32 separate parties and would terminate, with prejudice, nine of the suits which were then before the probate court, including the H lawsuit. The settlement would not be an admission of liability by any party to the settlement. The settlement provided for in the authorization order was approved by the attorney general of the State of Texas.[3]

---

[3]Texas Prop. Code Ann., sec. 123.002 (Vernon 1989) provides that:

In settlement of the H lawsuit, the authorization order provided that the charitable beneficiaries, the Warren children, and the attorney and Guardian Ad Litem would agree that the will should be modified only to the extent necessary to make the trusts valid under Louisiana law. The settlement agreement also provided that:

(s) The Co-Administrators, the Warren Children, the Attorney and Guardian Ad Litem, the Catholic Diocese, and St. Dominic Center shall agree that the Co-Administrators shall elect to deduct on and file, subject to receiving an Estate Tax Closing Letter, the United States Estate Tax Return for the Estate such administration expenses as would result in the residuary estate, as that term is defined in the Will, having a value for federal estate tax purposes of at least $18 million, resulting in an Annuity Amount, as that term is defined in the Will, equal to at least $1,530,000.00, and the Co-Administrators shall elect to deduct all other administration expenses on the federal income tax returns for the Estate.

* * * * * * *

(y) * * * The Co-Administrators, the trustees of the Children's Trust, and the trustees of the Grandchildren's Trust shall not be required under the provisions of the Will, Section 113.107 of the Texas Trust Code, or otherwise to apportion any proceeds or revenues from any oil and gas properties between income and principal, and they may account for such proceeds or revenues without regard to any apportionment between income and principal. * * *

In addition, the authorization order provided that the parties would agree that the Warren children would receive an amount equal to $750,000 ($1,250,000 less $500,000 to be paid to First City on behalf of the children). Finally, the authorization order provided that the charitable beneficiaries would agree that if, at the end of the annuity period, the properties held by the Dorothy J. Warren Charitable Lead Grandchildren's Trust did not have a fair market value at least equal to the "closing amount," the charitable beneficiaries would contribute cash equal to the difference between the closing amount and the value of the properties actually held by the Dorothy J. Warren Charitable Lead Grandchildren's Trust. The term, "closing amount," was defined as the future value of $270,000 on May 27, 2003 (up to a maximum of $865,926.58).

For and on behalf of the interest of the general public of this state in charitable trusts, the attorney general is a proper party and may intervene in a proceeding involving a charitable trust. The attorney general may join and enter into a compromise, settlement agreement, contract, or judgment relating to a proceeding involving a charitable trust.

On July 1, 1987, the coadministrators, the charitable beneficiaries, the Warren children, the attorney and Guardian Ad Litem, most creditors of the estate, certain of the Warren-King entities, and other interested parties entered into a Settlement and Release Agreement (the settlement agreement). The settlement agreement was drafted largely in accordance with the authorization order, except that, in connection with the calculation of the annuity amount, the settlement agreement provided as follows:

16. The Co-Administrators, the Warren Children, the Attorney and Guardian Ad Litem, the Catholic Diocese, and St. Dominic Center hereby agree that the Co-Administrators shall elect to file, subject to receiving an Estate Tax Closing Letter, the United States Estate Tax Return for the Estate as would result in the residuary estate, as that term is defined in the Will, having a value for federal estate tax purposes of at least $18 million, resulting in an Annuity Amount, as that term is defined in the Will, equal to at least $1,530,000.00. Subject to the foregoing, [the parties] hereby agree that all administration expenses shall be deducted on the Estate's U.S. Fiduciary Income Tax Returns to the extent there is accounting income available to allocate to (or pay for) those expenses (after taking into consideration all other expenses which should be charged to income) in any taxable year of the Estate and, to the extent accounting income is not so available, the administration expenses shall be considered a charge against the principal of the Estate and deducted on the United States Estate Tax Return for the Estate. * * *

On August 14, 1987, respondent mailed to petitioner, by certified mail, a notice of deficiency in which he determined a deficiency in petitioner's estate tax liability in the amount of $34,340,734.68.

On September 11, 1987, the coadministrators filed an Application for Instructions Regarding Allocation of Administration Expenses (the application) with the Probate Court. In the application, the coadministrators alleged that they had incurred substantial administration expenses in connection with the estate and that these expenses were incurred in the recovery and protection of the oil and gas properties of the estate. The coadministrators then pointed out that, under section 113.111 of the Texas Trust Code, such expenses can be charged either against principal or income. They also pointed out that section 113.107 of the Texas Trust Code provides for an allocation of the gross proceeds from the sale of oil and gas production of 27½

percent to principal and the balance to income. The coadministrators then requested instruction from the probate court on the equitable allocation of the administration expenses of the estate. On September 11, 1987, the probate court entered an order finding that oil and gas properties constituted a substantial majority of the value of decedent's estate. The Probate Court then stated its opinion that:

a fair and reasonable equitable allocation of the administration expenses would be to allocate and charge 72 1/2% of the administration expenses to the income from the sale of oil and gas production from the oil and gas properties of the Estate and 27 1/2% of the administration expenses to corpus of the estate * * * .

The Probate Court instructed the coadministrators to allocate and charge administration expenses of the estate 72½ percent to income and 27½ percent to principal.

On September 23, 1988, the Probate Court entered an agreed final judgment (the agreed final judgment) in the H lawsuit. The agreed final judgment notes the complexity, scope, and enormous expense incurred during administration of the estate and concludes that decedent could not have anticipated the magnitude of these expenses. The agreed final judgment also recites that decedent could not have anticipated the world-wide collapse in the demand for oil. Nor, according to the agreed final judgment, could decedent have anticipated the change in the nature of her assets from indirect equity interests to direct interests in oil and gas properties which produced substantial amounts of income but had little or no equity appreciation. The agreed final judgment further recites that:

IX.

allocation of the administration expenses wholly to the principal of the Estate would work a grave, unwarranted, and wholly unnecessary hardship on the Diocese by thwarting the Decedent's intent to leave a sizeable gift to the Diocese.

X.

Because of circumstances not known to or anticipated by the Decedent, reformation of the terms of the trusts the Decedent created is necessary to insure that the changed circumstances do not defeat or substantially impair the accomplishment of the purposes of these trusts. The Texas Trust Code authorizes judicial modification of the terms of a trust under

the circumstances set out in Paragraph IX above. TEX. PROP. CODE ANN. Section 112.054 (West 1988).

## XI.

The Parties have engaged in extensive, exhaustive, and often acrimonious settlement negotiations stretching over a period of several years, which negotiations resulted in a Settlement and Release Agreement * * * . As an integral part of the Settlement Agreement, the Parties agreed to a fair and equitable allocation of administration expenses between the principal and the interest produced by the trust properties. The Co-Administrators were instructed, authorized, and directed to make such an allocation by order of this Court dated September 11, 1987. The allocation is based on the Texas Trust Code, which provides that income from producing oil and gas properties is to be allocated 72½% to income and 27½% to principal. Charges in connection with the oil and gas properties have been allocated accordingly. TEX. PROP. CODE ANN. Sections 113.107 and 113.111 (West 1988). The allocation formula contained in the Settlement Agreement proved a crucial step in clearing the dense thicket of charges and counter-charges, claims and counterclaims surrounding and choking the administration of the Estate.

Finally, it was ordered, adjudged, decreed, and declared that the initial net fair market value of the assets constituting each of the trusts should be one-half of decedent's total gross estate for Federal estate tax purposes reduced only by the specific bequests provided for in decedent's will, the funeral expenses of the estate, the debts of the decedent, the mortgages and liens on the properties within the estate, the Federal estate taxes and State death taxes due from the estate, and *27½ percent of the administration expenses paid as of the date of the agreed final judgment.* The agreed final judgment also provided that, in no event, would the annuity amount paid to the charitable beneficiaries be less than $1,471,575.81.

On October 9, 1987, the Probate Court entered an Order Authorizing Co-Administrators to File Supplemental Tax Returns and Pay Taxes and Interest. In its order, the Probate Court instructed and authorized the coadministrators to file a supplemental United States Estate Tax Return and to pay Federal estate taxes in the amount of $925,722.33, plus interest in the amount of $431,139.42. Pursuant to the Probate Court's order, the coadministrators filed a document entitled, "SUPPLEMENTAL United States

Estate Tax Return," (the supplemental Form 706) and paid Federal estate taxes, plus interest in the ordered amounts.

On the supplemental Form 706, the value of the decedent's total gross estate was reported to be $28,352,519.91. On Schedule J of the supplemental Form 706, the estate reported administrative expenses in the amount of $2,034,889.09 which it then deducted from the decedent's total gross estate. This amount represents 27½ percent of the administration expenses incurred by the estate at the time of the filing of the supplemental Form 706. Schedule J also contains a statement that the remaining 72½ percent of administrative expenses would be deducted on the estate's United States Fiduciary Income Tax Returns. However, the estate did not file, with the Internal Revenue Service, a waiver of its right to claim these expenses as deductions in determining its Federal estate tax liability. On the supplemental Form 706, the estate reported the value of decedent's residuary estate to be $18 million and deducted $17,548,947 from the total gross estate as a charitable guaranteed annuity interest.

Petitioner filed United States Fiduciary Income Tax Returns (the original returns) for the taxable years ended November 30, 1983 through November 30, 1987 with the Internal Revenue Service Center at Austin, Texas. Petitioner subsequently filed Amended United States Fiduciary Income Tax Returns (the amended returns) for the taxable years ended November 30, 1983 through November 30, 1986 (but not for the taxable year ended November 30, 1987) with the Internal Revenue Service Center at Austin, Texas. On its amended returns for the taxable years ended November 30, 1983 through November 30, 1986 and its original return for the year ended November 30, 1987, petitioner claimed as deductions, in determining its income for those taxable years, administration expenses not in excess of 72½ percent of the total expenses of administration.

Respondent and petitioner agree that, for purposes of determining the estate tax due from the estate, the total gross estate of decedent is $28,352,519.91. Petitioner and respondent also agree that, as of July 31, 1988, petitioner had incurred and paid deductible funeral expenses of

$3,855.05 and deductible administration expenses of $8,523,834.44.[4] Petitioner and respondent further agree that, for purposes of determining the estate tax due from petitioner, the debts of decedent total $1,656,925.75 and mortgages and liens total $4,809,843.45.

## OPINION

Section 2001(a) imposes a tax, "on the transfer of the *taxable estate* of every decedent who is a citizen or resident of the United States." In order to determine the value of the estate subject to tax, it is first necessary to determine the value of the decedent's gross estate. According to section 2031(a), "The value of the gross estate of the decedent shall be determined by including * * * the value at the time of his death of *all* property, real or personal, tangible or intangible, wherever situated." (Emphasis supplied.) Income received by the estate during its administration is not included in gross estate for estate tax purposes. *Bowes v. United States,* 593 F.2d 272 (7th Cir. 1979); *Alston v. United States,* 349 F.2d 87, 88 (5th Cir. 1965); *Estate of Horne v. Commissioner,* 91 T.C. 100, 105 (1988). The value of the decedent's gross estate is then reduced by certain deductions provided for in sections 2053 through 2057 to arrive at the amount (the taxable estate) which is subject to tax under section 2001. Sec. 2051.

For purposes of determining the amount subject to the tax imposed by section 2001, the value of the gross estate is reduced by the administration expenses of the estate which are allowable under the laws of the jurisdiction where the estate is being administered. Section 2053(a)(2). However, under section 642(g), the estate may elect to deduct administration expenses on its income tax returns instead of on its estate tax return if it files a statement with the Secretary waiving its right to deduct such expenses under

---

[4]Petitioner and respondent agree that such funeral expenses are allowable as a deduction in determining the estate tax due from petitioner. Petitioner and respondent also agree that such administration expenses are allowable as a deduction in determining the estate tax due from petitioner, if petitioner chooses to deduct such expenses in determining its estate tax liability, rather than deducting such amounts on the income tax returns of petitioner for the taxable periods ended Nov. 30, 1984, through Nov. 30, 1987. Petitioner and respondent further agree that any additional expenses of administration approved by the probate court prior to 15 days before the rendering of an opinion by this Court will be considered in computing the estate tax due from petitioner.

section 2053(a)(2) in determining the amount subject to tax imposed by section 2001.

For purposes of determining the amount subject to tax under section 2001, the value of the gross estate is reduced by the amount of all bequests, legacies, devises, or transfers to or for the use of any corporation organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes (a charitable beneficiary). Sec. 2055(a)(2). The value of any interest transferred to a charitable beneficiary is deductible under section 2055 only to the extent that the value of such interest was included in the gross estate. Sec. 2055(d). Finally, where an interest in the same property passes both to a charitable beneficiary and a non-charitable beneficiary, no deduction is allowed unless, in the case of a non-remainder interest, the interest passing to the charitable beneficiary is in the form of a guaranteed annuity or is a fixed percentage distributed yearly of the fair market value of the property. Sec. 2055(e)(2).

In the instant case, respondent does not dispute that the interests passing to the charitable beneficiaries qualify as guaranteed annuities under section 2055(e)(2) and, thus, may be deducted by petitioner in computing decedent's taxable estate for purposes of the tax imposed by section 2001. Furthermore, the parties agree that the estate has incurred substantial administration expenses in the amount of $8,523,834.44 which are fully deductible by petitioner in computing the value of decedent's taxable estate if petitioner does not deduct such amounts on its income tax returns. The sole issue for our decision in this case is whether, for purposes of calculating the charitable annuity deduction, decedent's residuary estate (half of which constitutes the corpus of each trust) must be reduced by the full amount of the administration expenses under the provisions of Article III of decedent's will or only by 27½ percent of the estate's administration expenses as provided in the agreed final judgment of the probate court. Petitioner contends that, for purposes of determining the charitable deduction to which the estate is entitled under section 2055(a)(2), the amount of the charitable annuity should be calculated as provided for in the agreed final judgment

issued by Probate Court No. 3 of Dallas County, Texas. That is, petitioner claims that, for Federal estate tax purposes, the initial amount of residue passing into the trusts, on which the annuity amount is calculated, should be reduced by only 27½ percent of the administration expenses actually incurred by the estate.

It is clear that the resolution of the instant case will depend on the language of decedent's will and the Texas law applicable thereto. The resolution of ambiguities (if any) in decedent's will, the proper devolution of decedent's property, the composition of decedent's residuary estate, and the property from which administrative debts and expenses must be paid are all questions that must be answered under State law. See *Riggs v. Del Drago,* 317 U.S. 95 (1942); *Estate of Horne v. Commissioner,* 91 T.C. 100 (1988); *Estate of Fine v. Commissioner,* 90 T.C. 1068 (1988); *Estate of Reid v. Commissioner,* 90 T.C. 304 (1988). Furthermore, the parties agree that, to the extent State law is relevant, the laws of the State of Texas apply. However, it is equally clear that, because the probate court is not the highest court in the State of Texas, we are not bound by the Probate Court's judgment that a portion of administration expenses must be charged to income. *Commissioner v. Estate of Bosch,* 387 U.S. 456, 465 (1967); *Estate of Horne v. Commissioner, supra* at 105. Instead, we will apply what we find to be Texas law, after giving due regard to the relevant rulings of other Texas courts. *Commissioner v. Estate of Bosch, supra* at 465.

In *Estate of Horne v. Commissioner, supra,* the testator, who was a resident of South Carolina at the time of her death, devised the residue of her estate to a qualified charitable beneficiary. The executor of the testator's estate elected to deduct a portion of the estate's administrative expenses, namely the executor's commissions, on the estate's income tax return rather than on its estate tax return. In addition, the executor did not reduce the testator's gross estate by the full amount of administrative expenses in calculating the residue amount passing to the charitable beneficiary. The estate claimed a charitable deduction on its Federal estate tax return for the amount of this residue.

Respondent determined a deficiency in that estate's Federal estate tax liability based on his position that, for purposes of calculating that estate's charitable deduction, the amount passing to charity must be reduced by the executor's commissions incurred by that estate, even though such commissions might have been paid with post mortem income. The South Carolina Tax Commission also determined a deficiency in that estate's South Carolina estate tax liability for the very same reason. However, the Court of Common Pleas for the State of South Carolina, County of Orangeburg rejected the Commission's position based on a strict construction of the South Carolina statute defining "taxable estate."

We upheld respondent's position. *Estate of Horne v. Commissioner, supra* at 110. In so doing, we rejected, as unpersuasive, the reasoning of the Court of Common Pleas because such court failed to focus on the specific issue in controversy. See *Commissioner v. Estate of Bosch,* 387 U.S. 456 (1967). We first examined the will and found that it did not specify the source from which administrative expenses must be satisfied. In the absence of such direction in the will, we looked to the statutory and decisional law of the State of South Carolina to determine the source from which the executor's commissions must be paid.

The applicable South Carolina statute provided that, unless a decedent's will directs otherwise, *all* expenses incurred in connection with the settlement of a decedent's estate (e.g., the expenses of administration) were to be charged against the principal of the estate. Similarly, under South Carolina decisional law (as announced by the Supreme Court of South Carolina), the residue of an estate was defined as that which remains after satisfaction of all debts and bequests. *Dabney v. Estes,* 262 S.C. 336, 204 S.E.2d 387, 389 (1974). We concluded that executor's commissions charged against the principal of an estate under South Carolina statutory law reduce the amount of the estate's residue passing to the charitable beneficiary and, therefore, the amount of the charitable deduction available for Federal estate tax purposes. *Estate of Horne v. Commissioner, supra* at 109.

The Fifth Circuit Court of Appeals reached a similar conclusion in *Alston v. United States,* 349 F.2d 87 (5th Cir. 1965). The testator in that case, who was a resident of Georgia at the time of his death, also devised the residue of his estate to a duly qualified charitable beneficiary. As in *Estate of Horne v. Commissioner, supra,* the testator's executors did not deduct the full costs of administering the estate on the estate's Federal estate tax return but, instead, deducted a portion of such costs on the estate's income tax returns. Furthermore, the executors did not deduct the costs of administration from the gross estate in computing the residue of the estate passing to the charitable beneficiaries. Respondent, in disallowing a part of the charitable deduction claimed by the estate, contended that the deduction of administration expenses from post mortem income, rather than from the amount passing to charity, was improper for purposes of computing the charitable deduction.

The Fifth Circuit also upheld respondent's position. The court first noted that the testator's will did not specify the source from which the expenses of administration were to be paid. However, even in the absence of such direction it was clear that, under Georgia statutory and decisional law, such expenses were to be paid from the residuum of the estate passing to the charitable beneficiary. *Alston v. United States, supra* at 88-89. The court pointed out that, although the charitable beneficiary was entitled to receive the residue of the estate, under Georgia law a residuary legacy was nothing more than a general legacy into which fall all the assets of the estate after satisfaction of all other legacies and out of which are paid all debts of the estate and *all* costs of administration. *Alston v. United States, supra* at 89. Finally, as the court pointed out, if the executors were allowed to claim a charitable deduction based on the full amount of residue, unreduced by the costs of administration, the gross estate would effectively be increased by an amount of post mortem income equal to such administration costs, a result which was directly contrary to the statutory definition of gross estate contained in section 2031. *Alston v. United States, supra* at 89. Thus, for Federal estate tax purposes, the estate was

required to deduct the full amount of administration expenses from the gross estate in computing, the residue available for charity.

In the instant case, as in *Estate of Horne v. Commissioner, supra* and *Alston v. United States, supra,* we must first examine decedent's will to determine whether she directed that administration expenses be paid from any particular source. We conclude that articles III and V of decedent's will clearly and unambiguously direct that all expenses of administration be paid from the property passing to the trusts under the will and, therefore, the value of such property must be reduced by the amount of such expenses prior to calculation of the charitable annuity amount. Article III of decedent's will, which is entitled *"Debts, Expenses, and Taxes,'* provides that:

> *All* of my *just* debts, funeral expense, *administration* and testamentary expenses, and all estate, inheritance, transfer, and succession taxes upon or with respect to any property required to be included in my gross estate under the provisions of any tax law, whether or not passing hereunder, shall be paid out of my residuary estate passing under Article V hereof, without apportionment * * * . [Emphasis supplied.]

As is apparent from article III, *all* administration expenses are to be paid from the residue of decedent's estate. Only the remainder of such residue, after payment of *all* administrative expenses, is to pass, under article V of her will, to the trusts and form the basis for calculation of the charitable annuities. The language of article V clearly supports this conclusion.

In article V of her will, decedent devises and bequeaths all of the rest, residue, and remainder of her property to the trustees of the Dorothy J. Warren Charitable Lead Children's Trust and the Dorothy J. Warren Charitable Lead Grandchildren's Trust. Decedent further provides, in article V, that the *"property passing under this Article"* (emphasis supplied) is to be referred to as her residuary estate and that such property is intended to consist of her "entire testamentary estate after satisfaction of any gifts under Article IV hereof, and *after* payment of those debts, expenses, and taxes *referred to in Article III hereof * * * ."* (Emphasis supplied.) Thus, decedent directs that *all* administrative expenses be paid from property passing *under her*

*will* into the trusts. Decedent's reference to her "testamentary estate" as the source from which gifts and debts are to be paid is significant in that the Supreme Court of Texas has recognized that a testator's "testamentary estate" consists only of "testamentary assets" passing under the will. See *Sinnott v. Gidney,* 159 Tex. 366, 322 S.W.2d 507, 513 (1959). Payment of administrative expenses out of post mortem income, which indisputably is not property passing under her will, is contrary to the express provisions of decedent's will.

Despite decedent's apparently unambiguous directions in Article III and V of her will that all expenses of administration be paid from the property passing to the trusts under the will, petitioner contends that the wording of the will with respect to the allocation of administrative expenses and the calculation of the annuity amount is ambiguous. Petitioner argues that a bona fide and legitimate dispute arose among the charitable beneficiaries, the children, the grandchildren, and the unborn heirs of the decedent with respect to the allocation of administration expenses under the will. Furthermore, according to petitioner, circumstances unforeseen by decedent (i.e., enormous administration expenses and a change in the nature of decedent's assets) caused a latent ambiguity in the will to arise with respect to the allocation of administrative expenses.

Petitioner contends that, at the time decedent executed her will, it would have been reasonable for her to anticipate administration expenses of only $500,000 to $600,000. Had this been the amount of administrative expenses actually incurred, the charities would have received approximately 95 percent of her residuary estate computed with all deductions other than administrative expenses. Petitioner thus claims that it was decedent's overriding manifest intent to leave a sizable gift to the charitable beneficiaries. Petitioner points out that, if all administrative expenses which were eventually incurred are allocated to the property passing to the trusts, the charitable beneficiaries will only receive a gift of approximately 55 percent of decedent's residuary estate determined without taking into account the deduction for administrative expenses. Petitioner contends that, under these circumstances, the Probate Court was

empowered to construe and/or modify the will to provide an equitable allocation of administrative expenses between principal and post mortem income. Petitioner concludes that the Probate Court's allocation was proper under Texas law and should be respected for Federal estate tax purposes.

As petitioner points out, under the laws of the State of Texas, in construing a will, the primary duty of the court is to ascertain and give effect to the intent of the testator. *Stewart v. Selder*, 473 S.W.2d 3 (Tex. 1971); *Avis v. First National Bank of Wichita Falls*, 141 Tex. 489, 174 S.W.2d 255 (1943). However, according to the Supreme Court of Texas, the testator's intent must be ascertained by looking to the provisions of the instrument as a whole, as set forth within the four corners of the instrument. *Perfect Union Lodge No. 10 v. Interfirst Bank of San Antonio*, 748 S.W.2d 218 (Tex. 1988); *Henderson v. Parker*, 728 S.W.2d 768 (Tex. 1987); *Shriner's Hospital, etc. v. Stahl*, 610 S.W.2d 147 (Tex. 1981). In particular, no speculation or conjecture regarding the intent of the testator is permissible where the will is unambiguous. *Frost National Bank of San Antonio v. Newton*, 554 S.W.2d 149 (Tex. 1977). A Texas court will not redraft the will or add provisions under the guise of construction in order to effectuate some presumed intent of the testator. *Perfect Union Lodge No. 10 v. Interfirst Bank of San Antonio, supra* at 220. In the absence of ambiguity, a Texas court must construe the will based on the express language used. *Henderson v. Parker, supra* at 770; *Frost National Bank of San Antonio v. Newton, supra* at 153.

In our view, the provisions of decedent's will are not ambiguous (at least with respect to the allocation of administrative expenses). The express language of decedent's will unambiguously provides that administrative expenses are to be paid from the property passing into the trusts under decedent's will. The agreed final judgment does not purport to resolve any ambiguity in decedent's will nor does the Probate Court make any finding that the decedent's will was ambiguous with respect to the allocation of administrative expenses between principal and post mortem income. Rather, the thrust of the agreed final judgment is that decedent could not have anticipated the magnitude of administration expenses eventually incurred by the estate

or the change in the nature of her assets from indirect equity interests to direct income interests. The agreed final judgment provides that, in light of these unforeseen circumstances, it was necessary to re-allocate administrative expenses so that "the Decedent's intent to leave a sizable gift to the Diocese" would not be thwarted.

It may be, as petitioner contends and as stated in the agreed final judgment, that an inference could be drawn from the provisions of the will that decedent generally intended to leave a sizable gift to the charitable beneficiaries. However, there simply is no support in the will for petitioner's assumption that this intent was somehow manifest or all important. Absent an express declaration of purpose in the instrument, an ad hoc and speculative assessment as to which purpose decedent considered primary and which she considered merely incidental is unwarranted. *Frost National Bank of San Antonio v. Newton,* 554 S.W.2d 149, 154 (Tex. 1977). There is nothing in the provisions of decedent's will, the agreed final judgment, the record developed at trial, or otherwise, that any intent decedent may have had to make a sizeable gift to charity should override the express language in her will which directed her executors to pay all administrative expenses out of the property passing under Article V of her will.

Petitioner offered no evidence (credible or otherwise) that, if decedent had been aware of the circumstances which arose after her death, she would have provided for an allocation of administrative expenses which would result in a larger annuity amount. Petitioner in effect asks us to redraft decedent's will and re-allocate administration expenses in order to effectuate some claimed intent of decedent even though the existence of such intent is not supported by the evidence and contradicts the express terms of the will. *Perfect Union Lodge No. 10 v. Interfirst Bank of San Antonio, supra.* We conclude that the proper inference to be drawn from the express language of decedent's will is that decedent intended that the property passing under Article V of her will would bear the burden of all administrative expenses, that whatever remained thereafter would pass to the trusts, and that the annuity amount would be calculated on the basis of the initial net fair

market value of such remainder. In light of this conclusion, a reformation of decedent's will would be inappropriate even if we assumed, as petitioner contends, that a Texas court has equitable powers to reform a will when necessary to carry out a testator's intent.

Even if we were to accept petitioner's contention that the annuity calculation provisions of decedent's will are ambiguous, we would conclude that the agreed final judgment's allocation of administrative expenses to post mortem income is an incorrect application of Texas law. There is no statutory law in the State of Texas which specifies which administrative expenses or debts of an estate are to be paid from residue. For example, section 320 of the Texas Prob. Code Ann. (Vernon 1980) provides that claims against the estate are to be paid from the "funds" in the hands of the executors and administrators which belong to the estate but does not specify the source of such funds. Furthermore, while section 37 of the Texas Prob. Code Ann. (Vernon 1989) provides that property passing under a will or by intestacy is subject to the payment of debts of the testator, it does not *require* that debts be paid from property passing under the will (i.e., under a residuary clause), nor does it specify which property passing under the will is subject to the payment of debts. Despite this lack of guidance in Texas statutory law, Texas decisional law provides the correct answer.

In *Sinnott v. Gidney,* 322 S.W.2d 507, 513 (Tex. 1959), the Supreme Court of Texas held that, in the absence of direction in the will, all debts, administrative expenses, and taxes were to be paid solely from the testator's real estate (rather than personal property passing under the will) because such real estate passed under a residuary clause in the testator's will. In its discussion of the term "residue," the court made the following observations:

the gift by a testator of the "residue" or "rest, residue and remainder" of his estate is usually very significant. These expressions and words of similar import are ordinarily used in a will to refer to the portion of the estate that is left after all debts and legal charges have been paid and other testamentary gifts have been satisfied, and they have been given this construction by the courts on many occasions. The presumption is that the testator used them in that sense unless a contrary intention clearly appears. * * * [*Sinnott v. Gidney, supra* at 511.]

In *Republic National Bank of Dallas v. Commissioner,* 334 F.2d 348 (5th Cir. 1964), affg. 39 T.C. 85 (1962), the Fifth Circuit concluded that the above passage from *Sinnott v. Gidney, supra,* requires that, under Texas law, administrative expenses be paid from the *corpus* of a testator's estate in the absence of contrary directions in the will. *Republic National Bank of Dallas v. Commissioner, supra* at 350. The Fifth Circuit upheld our decision that, for Federal estate tax purposes also, the residue of the estate must be diminished by administrative expenses, prior to calculation of the estate's charitable deduction.

In this case, decedent has provided, in her will, express directions that all expenses of administration are to be paid from the property passing to the trusts under her will (i.e., the corpus of decedent's residuary estate). Decedent *did not* provide that, to the extent possible, the administrative expenses of her estate should be paid out of post mortem income so as not to decrease the annuity amount payable to the charitable beneficiaries. Furthermore, we conclude that, under Texas law, as expounded by the Supreme Court of Texas in *Sinnott v. Gidney, supra,* and the Fifth Circuit in *Republic National Bank of Dallas v. Commissioner, supra,* administrative expenses must be paid from the residue of a decedent's estate even in the absence of such direction.

The instant case is clearly distinguishable from our memorandum opinion in *Estate of Street v. Commissioner,* T.C. Memo. 1988-553, strongly relied on by petitioner. In *Estate of Street v. Commissioner, supra,* we held that interest on Federal and State taxes, as well as administrative expenses, did not reduce the principal of the estate passing to the testator's surviving spouse and, thus, did not decrease the estate's marital deduction. However, we based our decision in that case on several factors. First, the testator's will did not specify the source from which these expenses were to be paid. Second, the testator's will clearly gave the executors discretion to determine what expenditures were to be charged to principal or income. Third, the testator's will, as well as State law, clearly required that the executors take whatever action necessary to enlarge and protect the deduction at issue. None of these factors are

present in the instant case and, therefore, the holding in that case does not govern the issue in this case.

Petitioner next argues that, under Texas law, the term "residue" includes not only "residuary corpus" but also "residuary income," the latter term being equivalent to the income accumulated by the estate during administration which is attributable to the residuary corpus of the estate. Thus, according to petitioner, it begs the question to say that decedent intended that all administrative expenses be paid from her "residuary estate" or that the Supreme Court of Texas requires that administrative expenses be paid from "residue" absent contrary instructions in a will. The real issue is whether such expenses must be paid from the residuary corpus of the estate or the residuary income of the estate and, because decedent's will does not specify which, the will is ambiguous. In light of this ambiguity, petitioner contends that it was reasonable for the parties to the agreed final judgment to allocate 72½ percent of the administrative expenses to post mortem residuary income.

Petitioner's argument suffers from several fatal flaws. First, contrary to petitioner's assertion, the decedent's will does specify the source from which expenses are to be paid. Although post mortem income earned during administration of the estate accrues to the benefit of those who will ultimately receive the corpus of the estate, *Hurt v. Smith*, 744 S.W.2d 1, 6 (Tex. 1987), only corpus passes to such beneficiaries *under* a testator's will. Thus, when decedent provided, in article III of her will, that all administrative expenses were to be paid from her "residuary estate" and, in article V, equated her "residuary estate" with the property *passing under* article V of her will, she effectively specified that all administrative expenses were to be paid from the residuary corpus of her estate.

Second, any allocation of administration expenses to residuary income would run contrary to the Fifth Circuit's conclusion that Texas law requires such expenses to be paid from *corpus* in the absence of directions to the contrary in a testator's will. *Republic National Bank of Dallas v. Commissioner, supra* at 350. Third, as pointed out by the Fifth Circuit in *Alston v. United States,* 349 F.2d 87 (5th Cir. 1965), if the estate were allowed to claim a charitable

deduction based on the full amount of residue, unreduced by all costs of administration, the decedent's gross estate would effectively be increased by residuary post mortem income, a result directly contrary to the statutory definition of gross estate contained in section 2031. Fourth, petitioner has made no showing whatsoever that the administrative expenses allocated to income under the agreed final judgment were paid from post mortem *residuary* income, rather than from general post mortem income of the estate.

Finally, petitioner's argument that, in the absence of direction in decedent's will, administrative expenses may be allocated to post mortem residuary income is not supported by the only Texas case law we have discovered on the subject. The testator in *Stiff v. Fort Worth National Bank*, 486 S.W.2d 859 (Tex. Civ. App. 1972), bequeathed to each of two trusts a one-tenth interest in his residuary estate, which included income-producing oil and gas properties. He bequeathed the remaining eight-tenths of his residuary estate outright to three named beneficiaries to share and share alike. The testator's will provided that the executors of his estate were to have all the powers conferred in the will upon the trustee. The testator's will also authorized the "executors to use income from my estate during the period of administration to pay debts, taxes, and administration costs * * * ."

Despite this apparently unambiguous provision in the will, the trustee and the primary beneficiaries of the two trusts (the appellees) contended that income earned during the period of administration which was attributable to the trusts' portion of the residuary estate should not be burdened by its proportionate share of debts, taxes, and expenses of administration. The appellees claimed that the will provided for immediate assignment of royalty and mineral interests to the trusts and, therefore, the testator intended to provide immediate income from these interests to each of the primary beneficiaries of the trust. Thus, appellees argued, if such income was, instead, used to pay debts, expenses, and taxes, the testator's intent in this respect would be frustrated.

The Texas Court of Civil Appeals stated:

Two propositions appear to be clear concerning interpretation of wills in this respect. First, unless the will directs otherwise, debts, taxes and expenses of administration are to be paid out of the corpus of the residue, with all residuary devises and bequests to bear their proportionate part. Second, unless the will directs otherwise, income received during administration from the residuary estate goes to the residuary devisees and legatees proportionately, and debts, taxes and expenses of administration are not charged against such income. Thus in the absence of a contrary provision in the will, residuary income received during administration would not be charged with debts, taxes and expenses of administration. [*Stiff v. Fort Worth National Bank, supra* at 862. Citations omitted.]

However, the court concluded that, under the clear and express terms of the testator's will, the executors were permitted, in their sole discretion, to use either the principal or income of the testator's residuary estate to pay debts and that this provision of the testator's will was binding on the appellees. *Stiff v. Fort Worth National Bank, supra* at 864. Therefore, the general rules quoted above were inapplicable.

The instant case is obviously distinguishable from *Stiff v. Fort Worth National Bank, supra*. Here, there is no provision in the will authorizing or directing the executors to pay administrative expenses from post mortem residuary income. In fact, as stated above, we conclude that the decedent's will specifies that such expenses are to be paid from the residuary corpus passing under article V of her will. Thus, the general rule under Texas law, as enunciated by the court in *Stiff v. Fort Worth National Bank, supra*, controls the instant case. Under such rule, residuary income received during administration of decedent's estate cannot be charged with the expenses of administration.

Petitioner next points out that, in article II of her will, decedent provides that the executors of her estate are to have all the rights and powers conferred upon a trustee by the Texas Trust Act, Tex. Rev. Civ. Stat. Ann. articles 7425b-1 through 7425b-47 (Vernon 1960). The Texas Trust Act was repealed and recodified as the Texas Trust Code, Tex. Prop. Code Ann. sections 111.001 through 115.016 (Vernon 1984).[5] Petitioner argues that, because of this

---

[5]Respondent claims that, under sec. 111.006 of the Texas Trust Code, the Texas Trust Act continues to govern trusts created prior to Jan. 1, 1984 (decedent died on May 27, 1983) and thus applies in the instant case. On the other hand, petitioner, citing section 111.002(b) of the

reference in decedent's will, the allocation of administrative expenses must be determined under the provisions of the Texas Trust Code. Petitioner claims that the estate consisted in large part of oil and gas properties and because of this fact the allocation of administrative expenses agreed to by the parties was equitable and reasonable in light of section 113.107(d) of the Texas Trust Code which provides that certain natural resource *income* shall be allocated 27½ percent to principal and the balance to income. Tex. Prop. Code Ann. section 113.107 (Vernon 1984).

We disagree with petitioner's argument that the mere reference to the Texas Trust Act in article II of decedent's will somehow makes the Texas Trust Act applicable to the residuary provisions of her will or somehow empowers her executor to allocate administrative expenses in a manner which contravenes the clear language of article III and article V of her will. In essence, the language contained in article II merely authorizes the executors to undertake certain actions (or refrain from taking action) enumerated in the Texas Trust Act which, under normal rules of will construction, they might not otherwise be entitled to take. We do not consider this authorization contained in article II to alter, amend, or effect in any way the dispositive provisions of decedent's will. *Johnson v. Moore,* 223 S.W.2d 325, 329 (Tex. Civ. App. 1949).

Furthermore, although the Texas Trust Code grants far-reaching powers in administering trust properties, nowhere does the Texas Trust Code purport to grant a trustee unlimited discretion in allocating expenses between income and principal of a trust. Section 113.019 of the Texas Trust Code states only that, "A trustee may compromise, contest, arbitrate, or settle claims of or against the trust estate or trustee." Tex. Prop. Code Ann. section 113.019 (Vernon 1984). Section 113.111 of the Texas Trust Code, which governs the allocation of expenses between principal and income, provides that:

---

Texas Trust Code, argues that the Texas Trust Code is an amendment to the Texas Trust Act and, thus, governs any instrument which refers to the Texas Trust Act. Although there appears to be more support for respondent's position, *Perfect Union Lodge No. 10 v. Interfirst Bank of San Antonio,* 748 S.W.2d 218, 220 (Tex. 1988), we need not decide this issue since the Texas Trust Act and the Texas Trust Code are, in all relevant respects, identical. We cite to the Texas Trust Code merely for convenience.

(a) The following charges shall be made against income:

(1) ordinary expenses incurred in the administration, management, or preservation of the trust property * * *

\* \* \* \* \* \* \*

(5) all expenses reasonably incurred by the trustee for current management of principal and application of income;

(6) the portion of attorney's fees and the trustee's compensation for services in the management and administration of the trust estate * * *

\* \* \* \* \* \* \*

(b) The following charges shall be made against principal:

\* \* \* \* \* \* \*

(2) expenses reasonably incurred in connection with principal and court costs primarily concerning matters of principal;

(3) charges not provided for in Subsection (a) of this section, including * * * expenses incurred in maintaining or defending any action to construe the trust, to protect the trust or the trust property, or to assure the title of trust property;

[Tex. Prop. Code Ann. section 113.111 (Vernon 1984).]

It is clear from the record that the vast majority of expenses incurred by the estate fall under section 113.111(b) of the Texas Trust Code as expenses which must be charged against principal and petitioner admits as much in its brief. Petitioner had made no showing whatsoever that any of the expenses deducted from income under the agreed final judgment would be deducted from income under the Texas Trust Code. Thus, we find no basis in the Texas Trust Code for the allocation of any administrative expenses to income.

Even if we were to accept petitioner's argument that the Texas Trust Code governs the provisions of decedent's will and that the administrators of her estate were empowered to vary or change the provisions governing allocation of expenditures, as stated previously, we would conclude that the allocation of expenses selected by the parties to the agreed final judgment so clearly conflicts with the language of article III and article V that it would be unacceptable, in any event, under the Texas Trust Code. Our view is supported by section 111.002(a) of the Texas Trust Code which provides that, "If the provisions of [the Texas Trust Code] and the terms of a trust conflict, the terms of the trust control * * * ." Tex. Prop. Code Ann. sec. 111.002(a) (Vernon 1984). We find further support for our view in

section 113.001 of the Texas Trust Code which provides that, "A power given to a trustee by [the Texas Trust Code] does not apply to a trust to the extent that the instrument creating the trust, a subsequent court order, or another provision of [the Texas Trust Code] conflict with or limits the power." Thus, we conclude that, under the Texas Trust Code, the administrators of decedent's estate did not have the power to make the allocation in this case which so clearly conflicted with the provisions of decedent's will.

Finally, we conclude that section 112.054 of the Texas Trust Code does not require a different result. Section 112.054 of the Texas Trust Code permits a Texas court to modify the terms of a trust or direct the trustee of a trust to perform acts which are not authorized or are forbidden by the terms of the trust if, because of circumstances not known to or anticipated by the settlor, compliance with the terms of the trust would defeat or substantially impair the accomplishment of the purposes of the trust. Tex. Prop. Code Ann. sec. 112.054 (Vernon 1984). However, the court must exercise its discretion to modify the trust in a manner that most nearly conforms to the intention of the settlor. Unlike the parties to the agreed final judgment, we do not find that the decedent intended anything other than what she provided in her will. That is, she intended all administrative expenses to be paid from the property passing to the trusts under her will. Petitioner has offered no evidence to show or convince us that, if decedent had been aware of the circumstances which arose after her death, she would have provided otherwise.

We recognize that settlement agreements between beneficiaries of a will appear to be favored under Texas law. *Leon v. Keith,* 733 S.W.2d 372 (Tex. Ct. App. 1987); *Matter of Estate of Hodges,* 725 S.W.2d 265 (Tex. Ct. App. 1986). See also *Salmon v. Salmon,* 395 S.W.2d 29, 32 (Tex. 1965). The basis of these decisions is that where all interested parties agree on the disposition of a testator's property, their argument should be accepted by the court. In the instant case, the Federal government, who was not a party to the agreed final judgment, clearly had an interest in the outcome of the H lawsuit. Such interest was not taken into account by the parties in reaching their settlement. Under

*Commissioner v. Estate of Bosch,* 387 U.S. 456 (1967), we must apply the laws of the State of Texas as we find them to be, rather than the agreed final judgment (if the judgment does not comport with Texas law), in order to protect such interest. No matter how desirable it may be to encourage charitable contributions, we cannot simply ignore the clear language of the statutes and applicable decisions. *Alston v. United States,* 349 F.2d 87, 90 (5th Cir. 1965).

In our view the agreed final judgment incorrectly applies Texas law and we decline to follow it under the authority of *Commissioner v. Estate of Bosch, supra.* In light of this, we need not decide whether the agreed final judgment represents a bona fide arm's-length agreement between adverse parties. Thus, as in *Alston v. United States, supra,* and *Estate of Horne v. Commissioner,* 91 T.C. 100 (1988), in calculating the amount of the charitable bequest which the estate is entitled to deduct for Federal estate tax purposes, the residue of the estate must be reduced by all administrative expenses, not just those deducted by the estate on its Federal estate tax return.

*Decision will be entered under Rule 155.*

APPENDIX A

ARTICLE V

## Residuary Gift

I devise and bequeath as follows all of the rest, residue, and remainder of my property, whether real, personal, or mixed, of whatsoever kind and character and wheresoever situated, including lapsed and void legacies and devises (such property passing under this Article being referred to below as "my residuary estate," which is intended to consist of my entire testamentary estate after satisfaction of any gifts under Article IV hereof, and after payment of those debts, expenses, and taxes referred to in Article III hereof):

A. To Trustee one half (1/2) of my residuary estate to be held in a trust which shall be known as the Dorothy J. Warren Charitable Lead Children's Trust and which shall be held under the following provisions:

1. During the period of the trust, beginning on my date of death and ending 20 years after my date of death ("Annuity Period"), Trustee shall distribute annually to the Charity (as defined below) an amount equal to

eight and one-half percent (8½%) of the initial net fair market value of the assets constituting the trust ("Annuity Amount"). In determining such initial net fair market value, assets shall be valued at their values as finally determined for federal estate tax purposes. * * * The Annuity Amount shall be paid as of the end of each taxable year of the trust from income and, to the extent that income is not sufficient, from principal. * * * Any income of the trust for a taxable year in excess of the Annuity Amount shall be added to principal. The obligation to pay the Annuity Amount shall commence with the date of my death, but payment of the Annuity Amount may be deferred from the date of my death to the end of the taxable year in which occurs the complete funding of the trust. * * *

2. Any distribution to be made under this paragraph A to "the Charity' shall be made in equal shares to the Galveston-Houston Diocese of the Catholic Roman Churches in the United States, Its Territories and Possessions and Institutions Thereof, and Saint Dominic Diocesan Center * * * .

3. No additional contributions shall be made to the trust after the initial contribution, except that all property passing to the trust by reason of my death shall be considered one contribution for this purpose.

\*       \*       \*       \*       \*       \*       \*

5. Any trust properties remaining upon the expiration of the Annuity Period shall pass and be paid to my issue then living, per stirpes, outright and free of trust; provided that if any such person (i.e, an issue of mine) has not attained thirty-five (35) years of age, such properties which would have passed outright and free of trust to such person had he or she then attained said age shall be retained by Trustee in a separate trust for such person. * * *

(b) During the term of such trust after the expiration of the Annuity Period, the net income and principal in whole or in part may be paid to the beneficiary for any purpose in such amount or amounts as Trustee alone in its discretion may determine. Trustee may accumulate and add to principal any net income not so paid. In making such distributions, Trustee may but need not consider resources reasonably available to the beneficiary. The primary purpose of such trust shall be to provide for the support, maintenance, health, and education of the beneficiary during the term of such trust.

(c) If after the expiration of the Annuity Period the beneficiary has attained 25 years of age but not 30 years of age, Trustee shall then pay to the beneficiary one-third of the properties of such trust. If at such time the beneficiary has attained 30 years of age but not 35 years of age, Trustee shall then pay to the beneficiary two-thirds of the properties of such trust.

\*       \*       \*       \*       \*       \*       \*

B. To Trustee the other one-half (1/2) of my residuary estate to be held in a trust which shall be known as the Dorothy J. Warren Charitable

Lead Grandchildren's Trust and which shall be held under the following provisions:

1. During the period of the trust, beginning on my date of death and ending 20 years after my date of death ("Annuity Period"), Trustee shall distribute annually to the Charity (as defined below) an amount equal to eight and one-half percent (8½%) of the initial net fair market value of the assets constituting the trust ("Annuity Amount"). In determining such initial net fair market value, assets shall be valued at their values as finally determined for federal estate tax purposes. * * * The Annuity Amount shall be paid as of the end of each taxable year of the trust from income and, to the extent that income is not sufficient, from principal. * * * Any income of the trust for a taxable year in excess of the Annuity Amount shall be added to principal. The obligation to pay the Annuity Amount shall commence with the date of my death, but payment of the Annuity Amount may be deferred from the date of my death to the end of the taxable year in which occurs the complete funding of the trust. * * *

2. Any distribution to be made under this paragraph A to "the Charity' shall be made in equal shares to the Galveston-Houston Diocese of the Catholic Roman Churches in the United States, Its Territories and Possessions and Institutions Thereof, and Saint Dominic Diocesan Center * * * .

\*    \*    \*    \*    \*    \*    \*

3. No additional contributions shall be made to the trust after the initial contribution, except that all property passing to the trust by reason of my death shall be considered one contribution for this purpose.

\*    \*    \*    \*    \*    \*    \*

5. Any trust properties remaining upon the expiration of the Annuity Period shall pass and be paid * * * to my issue then living, per stirpes, outright and free of trust; provided that for purposes of this subparagraph 5 of paragraph B of Article V of my Will it will be assumed that all of my children who have issue then living are then deceased; further provided that if any such person has not attained thirty-five (35) years of age, such properties which would have passed outright and free of trust to such person had he or she then attained said age shall be retained by Trustee in a separate trust for such person. * * *

(a) If a child is born to or adopted after the expiration of the Annuity Period by any child of mine who also has one or more issue who are the beneficiaries of a trust created under provisions of this paragraph B of Article V, a new separate trust shall be established for such grandchild of mine on the date of the birth or adoption of such grandchild of mine. Trustee shall transfer to the new separate trust a portion of the trust property of each of the then existing separate trusts under this paragraph B of Article V in which the beneficiary has a parent who is also the parent of such new grandchild of mine, such portion to be ascertained as though the following steps were taken:

(i) The trust property in all such then existing separate trusts who have such beneficiaries, including undistributed income, is mingled in one trust fund; and

(ii) Each contributing separate trust is allocated an undivided interest in the mingled fund that is equal to such trust's proportionate contribution to the mingled fund; and

(iii) The mingled fund is divided into as many equal shares as there are trusts under this paragraph B of Article V in which the beneficiary has a parent who is also the parent of such new grandchild of mine, including the new separate trust; and

(iv) One such equal share is transferred from the mingled fund to the new separate trust; and

(v) The balance of the mingled fund is distributed to the contributing trusts, each receiving the portion of such balance that corresponds to its undivided interest in the original mingled fund.

Trustee's determination that the new separate trust has received what it is entitled to receive and that the directions given above have been complied with shall be conclusive on all concerned so long as Trustee acts in good faith.