EDWARD E. ROBINSON AND SANDRA ROBINSON, PETITIONERS
*v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 24665–91.          Filed February 2, 1994.

*John A. Townsend,* for petitioners.[1]
*Ansley Acree* and *Gerald Brantley,* for respondent.

---

[1] Petitioners were represented by *John A. Townsend* until Oct. 26, 1993; at that time, the Court allowed Mr. Townsend to withdraw as petitioners' attorney of record.

LARO, *Judge:* This case is before the Court pursuant to a petition filed by Edward E. Robinson and Sandra Robinson (petitioners) for a redetermination of respondent's determination reflected in her notice of deficiency issued to them on July 25, 1991. Respondent's notice of deficiency reflected her determination of deficiencies in petitioners' 1987 and 1988 Federal income taxes equal to $1,579,549 and $90,800, respectively.

A trial was held on this matter on February 23, 1993, in Houston, Texas. At the conclusion of the trial, the Court allowed respondent to amend her answer to conform to the evidence presented at the trial. Respondent alleged in her amendment that petitioners failed to report on their 1987 Federal income tax return $691,972.43 in additional settlement proceeds that petitioners "received" through a release of a judgment that they owed to the payor of the settlement.

The primary issue for decision is what portion of certain settlement proceeds that petitioners received in 1987 is excludable from their gross income under section 104(a)(2).[2] Petitioners contend that 95 percent of these proceeds is excludable from their gross income because the final judgment reflecting the settlement (final judgment) attributed the recovery of 95 percent of the proceeds to tortlike personal injuries. Respondent determined that 5 percent of these settlement proceeds was excludable from gross income; in her mind, the final judgment was insignificant because: (1) It did not reflect accurately the underlying settlement, and (2) the trial court did not independently review the allocation contained therein, and merely "rubber stamped" petitioners' out-of-court agreement. We agree with respondent that the allocation in the final judgment does not control this case and sustain her determination that petitioners reported erroneously that only 5 percent of the settlement proceeds was includable in their 1987 gross income. We disagree with respondent, however, that 95 percent of the proceeds is includable in petitioners' gross income; we find that petitioners must include 62.669 percent of the settlement proceeds in their gross income.

---

[2] Unless otherwise stated, all section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

As a secondary issue, we must decide whether petitioners had additional income of $691,972.43 in 1987, resulting from the release of the judgment that they owed the payor of the settlement. With regard to this issue, we conclude that petitioners had additional income in 1987 of $433,652.20; i.e., 62.669 percent of $691,972.43. We also conclude that petitioners may deduct, for 1987, related expenses of $70,949.67.[3]

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations and exhibits attached thereto are incorporated herein by this reference. Petitioners were husband and wife during the taxable years in issue; they resided in Texas at the time they filed their petition. Petitioners filed 1987 and 1988 Forms 1040, U.S. Individual Income Tax Return, using the status of "Married filing joint return".

In 1981, petitioners decided to open a furniture store in Hidalgo County, Texas, with a building that would be the largest furniture showroom in South Texas. Petitioners contracted with a builder to construct the building and obtained financing from Texas Commerce Bank-McAllen (bank). Petitioners initially borrowed $1,514,570 from bank; this initial loan was reflected in a deed of trust dated March 1, 1982. Petitioners subsequently borrowed $1,580,753.76 from bank to extend their initial loan; this subsequent loan was reflected in a deed of trust dated December 14, 1982. (Hereinafter, the initial and subsequent loans are collectively referred to as the construction loans.) The construction loans were secured solely by the building under construction and the underlying property. (Hereinafter, the building under construction and the underlying property are collectively referred to as the business property.)

In or about September 1982, after petitioners' furniture business had opened, bank entered into a contract with petitioners under which bank granted petitioners $165,000 in

---

[3] Respondent adjusted petitioners' 1987 taxable income by increasing the amount of the settlement proceeds that petitioners reported in their gross income. As a result of this increase in petitioners' 1987 gross and taxable incomes, respondent also adjusted: (1) A medical expense deduction that they reported for 1987, and (2) a net operating loss (NOL) deduction that they reported for 1988, and that was attributable to the NOL that they reported for 1987. Our resolution of the primary and secondary issues will necessitate a computational adjustment of petitioners' 1987 medical expense deduction and 1988 NOL deduction.

letters of credit to purchase inventory for their furniture business. Petitioners collateralized the letters of credit with a deed of trust on Bonanza, petitioners' real property unrelated to the business property; bank placed a lien on Bonanza. Bonanza was valued at $425,000 at the time of collateralization, was owned by petitioners as a "reserve" to assist them in troubled economic times, and was unencumbered immediately before this collateralization.

Petitioners paid off the $165,000 indebtedness in or before February 1983, and, in so doing, satisfied the terms of the letters of credit. As a result thereof, bank should have released its lien on Bonanza. Bank failed to do so.

Petitioners' furniture business experienced difficulties.[4] Faced with serious cash-flow problems, petitioners attempted to neutralize these problems by either selling Bonanza or borrowing against it. Petitioners learned at this time that bank had not released its lien on Bonanza, and asked bank to do so. Bank did not release its lien. Petitioners subsequently repeated their request on numerous occasions. Bank refused to honor any of these subsequent requests.[5]

Bank's refusal to release its lien on Bonanza devastated petitioners; their "reserve" was inaccessible to relieve the financial troubles of their business, and their business credibility with their suppliers was destroyed. Petitioners' furniture business failed, they were forced to sell inventory and other property at large losses, and they were driven into bankruptcy. In addition, Sandra Robinson developed severe psychological problems and required hospitalization.

On July 6, 1984, petitioners filed a complaint in the 206th District Court of Hidalgo County, Texas, against bank and its parent corporation, Texas Commerce Bancshares, Inc. (Commerce). (Hereinafter, unless otherwise noted, bank and Commerce are collectively referred to as defendants.) The

---

[4] Petitioners' furniture store was located near the Mexican border, and catered to customers from both sides of the border. Contemporaneously with the opening of their store, the Mexican peso was devalued, and the business climate in the area deteriorated. In addition, persons from Mexico stopped crossing the border to patronize petitioners' store.

[5] Texas Commerce Bank-McAllen (bank) contended that petitioners collateralized their loans of Mar. 1, 1982, and Dec. 14, 1982 (collectively referred to as the construction loans), with both: (1) The building under construction and the underlying property (collectively referred to as the business property) and (2) petitioners' other real property (Bonanza). As discussed below, a jury found subsequently that Bonanza was not collateral for the construction loans, and the failure of bank to release its lien on Bonanza upon petitioners' satisfaction of the underlying letters of credit was deliberate and wrongful.

nub of petitioners' complaint against defendants was that defendants failed improperly to release their lien on Bonanza, and, as a result thereof, prevented petitioners from obtaining funds necessary to maintain their furniture business. Defendants' failure to release the lien, petitioners claimed, ultimately forced them to close their furniture business and damaged them in their business and personal affairs.

On June 3, 1986, bank foreclosed on the business property. At the time of foreclosure, the amount due on the construction loans was $2,053,759.08. A nonjudicial foreclosure sale of the business property was held on the same day as the foreclosure; the business property was sold at the sale for $1,475,000, and the sale price was applied against the amount due on the construction loans, leaving a deficiency of $578,759.08.

On April 13, 1987, a jury trial commenced in petitioners' lawsuit against defendants; Judge Joe B. Evins presided. At this time, petitioners' most recent pleadings were their: (1) Second amended original petition and (2) first supplemental petition and answer. Petitioners' second amended original petition alleged, in part, that defendants' failure to release the lien on Bonanza was willful, an act of malice and in reckless and conscious disregard of petitioners' rights, unconscionable, based on false representations, tortious, and a cloud on title.[6] Petitioners prayed for the following damages: (1) Lost profits of $20 million, (2) $250,000 for losses that petitioners incurred on the forced sales of properties other than Bonanza, (3) $200,000 for amounts incurred by petitioners in their futile attempt to save their business, (4) $5 million for severe mental anguish suffered by petitioners before trial, (5) $5 million for future severe mental anguish of petitioners, and future damage to petitioners' reputations, (6) exemplary (punitive) damages of five times the amount of actual or compensatory damages awarded in the case, (7) attorney's fees as proven at trial, (8) prejudgment interest as

---

[6] Petitioners asserted the following breach of contract and tort claims in their lawsuit against bank and Texas Commerce Bancshares, Inc. (Commerce), bank's parent corporation (hereinafter, unless otherwise noted, bank and Commerce are collectively referred to as defendants): (1) Breach of defendants' contractual obligation to release the lien on Bonanza as required by the deed of trust, (2) breach of statutory and common law duties of good faith and fair dealing arising from defendants' breach of their contract with petitioners, (3) fraudulent misrepresentation, (4) conversion, and (5) slander of title.

authorized by the Texas Supreme Court, (9) postjudgment interest as applicable, (10) their court costs, (11) all damages allowed by the Texas Deceptive Trade Practices Act, and (12) that the lien on Bonanza be declared null and void, and of no force and effect, thereby removing the cloud on the title to Bonanza.[7]

After both sides rested, approximately 1 month after the trial began, the trial court granted a motion for directed verdict in favor of Commerce; it was dismissed from the action. Shortly thereafter, on May 11, 1987, petitioners' case against bank was submitted to the jury.

On May 12, 1987, the jury returned its verdict.[8] The jury found that: (1) Petitioners did not expressly or impliedly agree to give bank a lien on Bonanza for the construction loans; (2) bank made fraudulent misrepresentations; (3) bank's fraudulent misrepresentations were the proximate cause of damages to petitioners; (4) a special relationship existed between petitioners and bank; (5) bank did not act in good faith in its dealings with petitioners during the time in issue there; (6) bank's failure to act in good faith was the proximate cause of petitioners' damages; and (7) bank's conduct was intentional, willful, and in wanton disregard of petitioners' rights.

The jury awarded petitioners the following damages: (1) $1 million in pretrial lost profits, (2) $5 million in posttrial lost profits, (3) $175,000 in out-of-pocket and actual damages, (4) $85,000 in pretrial damage to petitioners' credit reputations, (5) $500,000 for past mental anguish suffered by Sandra Robinson, (6) $500,000 for future mental anguish of Sandra Robinson, (7) $250,000 for past mental anguish suffered by Edward Robinson, (8) $250,000 for future mental anguish of Edward Robinson, (9) $1.5 million in attorney's fees, and (10) $50 million in punitive damages. On May 18, 1987, petitioners filed a motion for judgment on the verdict; the trial court granted this motion on May 20, 1987, and entered a judgment on the verdict accordingly. Further, the trial court found, and included in its entered judgment, that: (1)

---

[7] In petitioners' memoranda of law filed with the Texas trial court, petitioners indicated that the lawsuit was brought partially under the Texas Deceptive Trade Practices Act in order to recover attorney's fees. See Tex. Bus. & Com. Code Ann. sec. 17.50(d) (West 1987).

[8] Judge Joe B. Evins later informed petitioners that their trial was one of the longest trials in which he had been involved, and that their trial was stressful to him and to the members of the jury.

Petitioners were entitled to $881,919.61 in prejudgment interest, (2) bank was entitled to a counterclaim (by way of setoff) of $691,972.43, (3) bank was liable for all court costs, and (4) postjudgment interest would accrue at 10 percent per annum.[9]

After the verdict, and continuing after the judgment was entered on May 20, 1987, bank attempted to eliminate or mitigate the effect of the jury verdict through posttrial pleadings and settlement discussions. Petitioners and bank each hired prominent attorneys to represent them in these posttrial proceedings and to represent them in a possible appeal; both sides anticipated that bank would appeal if the matter was not settled in posttrial proceedings, and petitioners had the right to appeal the trial court's dismissal of Commerce. Bank's posttrial pleadings included separate motions for a new trial, to reform the judgment, and for judgment notwithstanding the verdict.

Between May 20, 1987, and July 30, 1987, counsel for petitioners and bank engaged in settlement discussions.[10] Petitioners and bank both wanted to avoid the expense, difficulty, and uncertainty of an appeal. From petitioners' point of view, they were also interested in settling their dispute with bank because they wanted to receive their recovery quickly. In addition, petitioners were informed by their counsel there that the award of $50 million in punitive damages was the result of a "runaway jury", and would most likely be vacated or reduced upon appeal.[11]

On July 30, 1987, after the trial court heard bank's motion for a new trial, petitioners and bank agreed to settle their dispute.[12] Immediately after accepting bank's offer, petition-

---

[9] Bank's $691,972.43 judgment against petitioners was for the deficiency on the nonjudicial foreclosure sale of the business property ($578,759.08), interest from the date of foreclosure to the date of judgment ($55,337.44), and attorney's fees ($57,875.91).

[10] During these discussions, petitioners were concerned with the amount of taxes that they would have to pay to the Government on the settlement proceeds. In connection therewith, petitioners sought expert advice on the tax consequences from the receipt of settlement proceeds.

[11] Petitioners' counsel also informed petitioners of numerous cases in which Texas appellate courts vacated jury awards of large punitive damages.

[12] Bank had previously offered to settle petitioners' lawsuit by paying them $10 million and forgiving its $691,972.43 judgment against petitioners, and had previously informed petitioners that this was bank's best settlement offer from petitioners' point of view. Bank had also offered, as part of this settlement, to allow petitioners to structure the settlement between taxable and nontaxable components in any manner that petitioners desired. In this Court, petitioners' lead counsel during the settlement discussions recounted these discussions as follows:

I asked [bank's counsel], would there be any objection on their part on how [a settlement] would

ers and bank announced to the trial court that they had reached a settlement of the case. The terms of the settlement were that bank would pay petitioners $10 million in cash in exchange for petitioners' providing bank a complete release from any further liability on all claims that petitioners had against bank or Commerce. In addition, bank would release its judgment against petitioners in the amount of $691,972.43, and would work with petitioners on the allocation of the settlement proceeds to minimize petitioners' Federal income tax liability. Bank knew that petitioners wanted to allocate any settlement proceeds in a manner that would minimize their taxes, and did not care about the manner of allocation. Bank agreed with petitioners that they could allocate the settlement proceeds in any manner that petitioners desired.

In connection with their settlement, petitioners and bank executed a compromise agreement (settlement agreement), entitled Full and Final General Release and Agreement. The settlement agreement did not contain an allocation of the $10 million payment or reference the $691,972.43 judgment awarded to bank against petitioners. Petitioners subsequently prepared the final judgment and presented it to bank's representatives; petitioners and bank later presented the final judgment to Judge Evins at his home for his signature. The meeting at Judge Evins' home started late in the evening and lasted no longer than 1 hour; neither the final judgment nor the settlement agreement was discussed in detail.

The final judgment was entered by the trial court on July 31, 1987, and vacated the judgment entered on May 20, 1987. The final judgment incorporated the settlement agreement by reference, and allocated 95 percent of the $10 million payment in the settlement agreement to mental anguish and 5 percent to pretrial lost profits.[13] Petitioners' counsel determined this allocation solely to minimize the amount of

---

be structured if we went in and set the [judgment based on the jury verdict] aside. He said, None.

He said, We don't care how you do it, just so it is paid and we can get it over with, and we will cooperate with you in any way you see fit. If you can get any tax benefit, fine. If you— you know, he didn't have any ax to grind, and he didn't care. He made it plain.

[13] The final agreement apportioned petitioners' recovery for mental anguish as follows: 50 percent to mental anguish that Edward Robinson had suffered in the past, and 50 percent to mental anguish that Sandra Robinson had suffered in the past.

taxes that petitioners would have to pay on the settlement proceeds.[14] Petitioners' counsel intended that the 5-percent allocation to lost profits would be the starting point for petitioners to negotiate with respondent as to the amount of taxes payable on the settlement proceeds.

By check dated August 4, 1987, petitioners received their share of the $10 million payment; i.e., $4,935,151.72; the balance of the $10 million payment, $5,064,848.28, went to petitioners' attorneys. Petitioners reported $246,758 of the settlement proceeds, or 5 percent of $4,935,151.72, on their 1987 Form 1040 as miscellaneous income.[15] Petitioners did not report any portion of the $691,972.43 release on their 1987 Form 1040.[16]

## OPINION

The burden of proof is on petitioners to show that respondent's determinations set forth in her notice of deficiency are incorrect. Rule 142(a); *Welch v. Helvering,* 290 U.S. 111, 115 (1933). Respondent bears the burden of proving the increase in the deficiency asserted in her amended answer. Rule 142(a); *Estate of Bowers v. Commissioner,* 94 T.C. 582, 595 (1990). We turn to the issues for decision.

### 1. *Sections 61(a) and 104(a)(2)*

Section 61(a) generally requires that individual taxpayers include in their gross income all income from whatever

---

[14] Petitioners' counsel showed the final judgment to petitioners before presenting it to Judge Evins for his signature; petitioners wanted to verify that the tortlike personal injury allocation was contained in the final judgment. Petitioners believed at the time of the settlement agreement that damages awarded for mental anguish were excludable from income under sec. 104(a)(2), and wanted to avoid paying taxes on as much of the settlement as possible.

[15] Taxpayers generally may deduct legal fees that are incurred in connection with a lawsuit to the extent that the fees are ordinary and necessary business expenses under sec. 162. Taxpayers may not deduct legal fees, however, to the extent that the fees are allocable to a class of income exempt from taxation. In the case of a settlement that includes damages both includable in income under sec. 61(a) and excludable from income under sec. 104(a)(2), the Court generally determines the deductibility of any underlying legal fees by allocating the fees in the same proportion as the excludable and includable portions of the settlement. *Stocks v. Commissioner,* 98 T.C. 1, 18 (1992). Because respondent's determination was based solely on the net proceeds received by petitioners, and the parties have not raised the issue of the proper treatment of petitioners' legal fees, we limit our inquiry to the net settlement proceeds received by petitioners and do not address the deductibility of their legal fees.

[16] Petitioners conceded on brief that the portion of the release that is attributable to other than tortlike personal injuries is additional settlement proceeds that are taxable to them. Respondent conceded on brief that petitioners may deduct the other than tortlike personal injury portions of the following amounts related to these additional settlement proceeds: (1) Interest of $55,337.44 and (2) attorney's fees of $57,875.91. See *supra* note 9.

source derived, absent a contrary provision in subtitle A of the Internal Revenue Code (secs. 1 to 1563). The definition of gross income under section 61(a) sweeps broadly to encompass any accession to a taxpayer's wealth. *United States v. Burke,* 504 U.S. ___, 112 S. Ct. 1867, 1870 (1992); *Commissioner v. Glenshaw Glass Co.,* 348 U.S. 426, 431 (1955). By contrast, exclusions from gross income are matters of legislative grace and are construed narrowly in order to maximize the taxation of any accession to wealth. *United States v. Burke,* 504 U.S. at ___, 112 S. Ct. at 1878 (Souter, J., concurring in the judgment). Given the broad sweep of inclusions vis-a-vis the narrow construction of exclusions, it naturally follows that an accession to wealth is prima facie includable in gross income under section 61(a) unless a narrowly construed exclusion in sections 1 through 1563 clearly directs otherwise. *United States v. Burke,* 504 U.S. at ___, 112 S. Ct. at 1878 (Souter, J., concurring in the judgment).

Petitioners claim that section 104(a)(2) is such an exclusion that clearly directs otherwise. Under section 104(a)(2), gross income does not include the amount of any damages received (whether by suit or agreement) on account of personal injuries or sickness. From that section, and the regulations thereunder, we understand that damages received through a settlement of a lawsuit are excludable from gross income only if the damages were received on account of a "tortlike personal injury". For this purpose, no distinction is drawn between tortlike personal injuries that are physical versus tortlike personal injuries that are nonphysical (i.e., psychological). *Threlkeld v. Commissioner,* 87 T.C. 1294, 1297 (1986), affd. 848 F.2d 81 (6th Cir. 1988); *Seay v. Commissioner,* 58 T.C. 32, 40 (1972); see also *United States v. Burke,* 504 U.S. at ___, 112 S. Ct. at 1871–1872. Thus, for example, damages are excludable from gross income under section 104(a)(2) if the damages were received pursuant to a settlement of a tortlike personal injury that resulted in: (1) Mental anguish, *Threlkeld v. Commissioner, supra* at 1297; *Church v. Commissioner,* 80 T.C. 1104, 1110 (1983); *Seay v. Commissioner, supra* at 37–38; see also *United States v. Burke,* 504 U.S. at ___, 112 S. Ct. at 1871–1872; (2) injury to reputation, *Threlkeld v. Commissioner, supra;* or (3) punitive damages, *Horton v. Commissioner,* 100 T.C. 93, 96 (1993); see also *Miller v. Commissioner,* 93 T.C. 330, 337–342 (1989),

revd. 914 F.2d 586 (4th Cir. 1990).[17] On the other hand, damages are not excludable from gross income under section 104(a)(2) if, for example, the damages were received pursuant to the settlement of economic rights arising out of a contract (e.g., lost profits). Sec. 104(a)(2); *Stocks v. Commissioner,* 98 T.C. 1, 9 (1992); *Downey v. Commissioner,* 97 T.C. 150, 160 (1991), adhered to on reconsideration 100 T.C. 634 (1993); sec. 1.104–1(c), Income Tax Regs.; see also *United States v. Burke,* 504 U.S. at ____, 112 S. Ct. at 1870–1871 ("A 'tort' has been defined broadly as a civil wrong, other than breach of contract, for which the court will provide a remedy in the form of an action for damages" (quotation marks and citation omitted)). Amounts received on account of a tortlike personal injury are also not excludable from gross income under section 104(a)(2) if the amounts were received as statutorily imposed interest. *Kovacs v. Commissioner,* 100 T.C. 124, 130 (1993).

In the context of a settlement agreement, the nature of the claim underlying the taxpayer's damage award, rather than the validity of his or her claim, determines whether he or she received the damages on account of tortlike personal injuries. *United States v. Burke,* 504 U.S. at ____, 112 S. Ct. at 1872; *Stocks v. Commissioner, supra* at 10; *Downey v. Commissioner,* 97 T.C. at 161; *Metzger v. Commissioner,* 88 T.C. 834, 847 (1987), affd. without published opinion 845 F.2d 1013 (3d Cir. 1988); *Bent v. Commissioner,* 87 T.C. 236, 244 (1986), affd. 835 F.2d 67 (3d Cir. 1987). Such a determination is factual and is generally made by reference to the settlement agreement in light of the surrounding circumstances. *Knuckles v. Commissioner,* 349 F.2d 610, 613 (10th Cir. 1965), affg. T.C. Memo. 1964–33; *Stocks v. Commissioner, supra* at 10; *Seay v. Commissioner, supra* at 37; *Miller v. Commissioner,* T.C. Memo. 1993–49 (on remand), supplemented by T.C. Memo. 1993–588. A key question to ask is: "In lieu of *what* were the damages awarded?" *Raytheon Production Corp. v. Commissioner,* 144 F.2d 110, 113 (1st Cir. 1944) (quoting *Farmers' Merchants' Bank v. Commis-*

---

[17] Sec. 7641(a) of the Omnibus Budget Reconciliation Act of 1989 (OBRA), Pub. L. 101-239, 103 Stat. 2106, 2379, amended sec. 104 to make its exclusion inapplicable to punitive damages received in cases not involving physical injury or sickness. This limitation is not applicable to the years in issue; the amendment is inapplicable to amounts received before July 11, 1989. OBRA sec. 7641(b); *Horton v. Commissioner,* 100 T.C. 93, 94 n.2 (1993).

*sioner,* 59 F.2d 912 (6th Cir. 1931); emphasis added), affg. 1 T.C. 952 (1943); see also *Getty v. Commissioner,* 913 F.2d 1486, 1490 (9th Cir. 1990), revg. 91 T.C. 160 (1988); *Church v. Commissioner, supra* at 1107.

When the settlement agreement allocates clearly the settlement proceeds between tortlike personal injury damages and other damages, the allocation is generally binding for tax purposes (and the tortlike personal injury damages are excludable under section 104(a)(2)) to the extent that the agreement is entered into by the parties in an adversarial context at arm's length and in good faith. *Threlkeld v. Commissioner,* 87 T.C. 1294, 1306–1307 (1986), affd. 848 F.2d 81 (6th Cir. 1988); *Fono v. Commissioner,* 79 T.C. 680, 694 (1982), affd. without published opinion 749 F.2d 37 (9th Cir. 1984); see also *Mitchell v. Commissioner,* T.C. Memo. 1990–617 (allocation of lump-sum payment in settlement document was not binding where taxpayer drafted the document without the participation or approval of his adversary), affd. 992 F.2d 1219 (9th Cir. 1993). An important factor in determining the validity of the agreement is the "intent of the payor" in making the payment. *Knuckles v. Commissioner, supra* at 613; *Agar v. Commissioner,* 290 F.2d 283, 284 (2d Cir. 1961), affg. per curiam T.C. Memo. 1960–21; *Metzger v. Commissioner, supra* at 847–848. If the payor's intent cannot be clearly discerned from the settlement agreement, his or her intent must be determined from all the facts and circumstances of the case in issue there.[18] Factors to consider include the details surrounding the litigation in the underlying proceeding, the allegations contained in the payee's complaint and amended complaint in the underlying proceeding, and the arguments made in the underlying proceeding by each party there. See, e.g., *Estate of Morgan v. Commissioner,* 332 F.2d 144, 150–151 (5th Cir. 1964), affg. in part and revg. in part 37 T.C. 31 (1961); *Threlkeld v. Commissioner, supra* at 1306; *Bent v. Commissioner, supra* at 245. None of these factors is always outcome-determinative; in a given case, any of these factors may ultimately be

---

[18] In the context of a damage award, the focus is on the basis on which the trier of fact awarded the damages. *Metzger v. Commissioner,* 88 T.C. 834, 848 (1987), affd. without published opinion 845 F.2d 1013 (3d Cir. 1988); *Bent v. Commissioner,* 87 T.C. 236, 245 (1986), affd. 835 F.2d 67 (3d Cir. 1987); see also *Miller v. Commissioner,* T.C. Memo. 1993–49 (on remand), supplemented by T.C. Memo. 1993–588.

persuasive or ignored. *Threlkeld v. Commissioner, supra* at 1306.

With these principles in mind, we proceed to analyze the settlement agreement and the final judgment.

2. *Allocation of Damages in the Settlement Agreement and the Final Judgment*

The settlement agreement contains no allocation of the settlement proceeds; the final judgment does. Petitioners contend that the allocation in the final judgment dictates the treatment of their recovery for Federal income tax purposes. In particular, petitioners contend, Judge Evins, petitioners, and bank were in the best position to make a good faith assessment of the damages suffered by petitioners as a result of bank's conduct, and the allocation in the final judgment was made by them in good faith and based on the facts and law as each person knew them to be. Accordingly, petitioners conclude, this Court and respondent are bound by their allocation absent proof by respondent that the allocation was made in bad faith.

We disagree with petitioners' contentions.[19] The record does not support petitioners' claim that they, Judge Evins, and bank each assessed the damages and allocated petitioners' recovery accordingly. The events preceding the execution of the settlement agreement indicate that petitioners and bank wanted to avoid the expense, difficulty, and uncertainty of an appeal. These events also indicate that bank wanted to settle all claims asserted by petitioners in their second amended original petition, and do not indicate that, in agreeing to the terms contained in the settlement agreement and the final judgment, bank intended to settle one claim to the exclusion of another.[20] Further, counsel for petitioners and bank did not discuss the merit of any particular claim; they merely agreed to a $10 million payment (and forgiveness of

---

[19] We quickly dispense with petitioners' contention that respondent must prove that the allocation in the final agreement was made in bad faith; as previously mentioned, petitioners generally bear the burden of proof in this Court. Although respondent bears the burden of proof in certain instances, see generally Rule 142(a) and (b); *Portillo v. Commissioner*, 932 F.2d 1128, 1133 (5th Cir. 1991), affg. in part and revg. in part T.C. Memo. 1990–68, the instant case is not one of those instances.

[20] We note that, in agreeing to settle petitioners' lawsuit, bank never acknowledged or denied liability with respect to any of the claims.

bank's judgment) in satisfaction of all of petitioners' claims against defendants.

The record indicates that bank offered to settle the case for $10 million and forgiveness of its judgment against petitioners; this was all bank would concede. Bank was not concerned with the amount of the settlement proceeds that was allocated to tortlike personal injury damages vis-a-vis other damages. From petitioners' point of view, however, the allocation was critical to their after-tax recovery; i.e., petitioners would be taxed on their receipt of the settlement proceeds to the extent that the proceeds were not allocated to tortlike personal injuries. Secs. 61(a), 104(a)(2). Petitioners therefore desired, and were given, the unfettered discretion to allocate the settlement proceeds in any manner they desired in order to minimize their Federal income tax liability. We find that petitioners deliberately and unilaterally arrived at the allocations contained in the final judgment solely with a view to Federal income taxes, and not to reflect the realities of their settlement.

We also disagree with petitioners that the record indicates that Judge Evins made an independent review of the allocation of damages. The parties came to his house with an agreed settlement, and he entered the judgment agreed to by the parties. Contrary to petitioners' request, this Court will not blindly accept the terms contained in a settlement agreement, especially when the circumstances behind the agreement indicate that the allocation of the amounts contained therein was uncontested, nonadversarial, and entirely tax-motivated.

Petitioners argue that this Court, as well as other Federal courts, is precluded from challenging the allocations contained in the final judgment because the State trial court has determined petitioners' rights and included its determination in the final judgment. According to petitioners, they must prevail in this matter even if the Court finds that the allocation in the final judgment is an incorrect allocation. To support their argument, petitioners cite *Commissioner v. Estate of Bosch,* 387 U.S. 456 (1967), and the interpretation and application of *Bosch* by the Court of Appeals for the Fifth Circuit in *Estate of Warren v. Commissioner,* 981 F.2d 776 (5th Cir. 1993), revg. and remanding 93 T.C. 694 (1989), and *Brown v. United States,* 890 F.2d 1329 (5th Cir. 1989).

We disagree with petitioners that this trilogy of cases resolves the instant case in their favor. In *Commissioner v. Estate of Bosch,* 387 U.S. 456, 456–457 (1967), the Supreme Court considered two Federal estate tax cases that presented a common question: "Whether a federal court or agency in a federal estate tax controversy is conclusively bound by a state trial court adjudication of property rights or character-ization of property interests when the United States is not made a party to such proceeding." In holding that neither a Federal court nor a Federal agency is so bound, the Court first noted that both State court proceedings were brought to affect directly the outcome of Federal estate tax liabilities in cases that were pending in this Court, and that the Commis-sioner was not a party to either of these State proceedings. *Id.* at 457, 463. Because the Commissioner was not a party in the State proceedings, the Court observed, neither res judicata nor collateral estoppel applied to the proceedings before the Court. *Id.* at 463.

In addition, the Court noted, the legislative history under-lying the estate tax provision before the Justices needed to be considered because the Court was interpreting a Federal taxation statute. Based on this legislative history, the Court observed that State court interpretations of a will should be given "proper regard" by a court if, and only if, the State court entered the interpretations "in a bona fide adversary proceeding." *Id.* at 463–464 (quoting S. Rept. 1013 (Part 2), 80th Cong., 2d Sess. 4 (1948)). As stated by the Court:

We cannot say that the authors of this [legislative] directive intended that the decrees of state trial courts were to be conclusive and binding on the computation of the federal estate tax as levied by the Congress. If the Con-gress had intended state trial court determinations to have that effect on the federal actions, it certainly would have said so—which it did not do. [*Commissioner v. Estate of Bosch,* 387 U.S. 456, 464 (1967).]

The Court then noted that, in cases of diversity jurisdic-tion, "while the decrees of lower state courts should be attrib-uted some weight . . . the decision [is] not controlling . . . where the highest court of the State has not spoken on the point". *Id.* at 465 (quotations and citations omitted; ellipsis points and alteration in original). The Court concluded by stating:

This is not a diversity case but the same principle may be applied for the same reasons, viz., the underlying substantive rule involved is based on state law and the State's highest court is the best authority on its own law. If there be no decision by that court then federal authorities must apply what they find to be the state law after giving "proper regard" to relevant rulings of other courts of the State. In this respect, it may be said to be, in effect, sitting as a state court. [*Id.* at 465; emphasis omitted.]

Twenty-two years after *Estate of Bosch,* in *Brown v. United States,* 890 F.2d 1329 (5th Cir. 1989), the Court of Appeals for the Fifth Circuit applied *Estate of Bosch* in an income tax case. In *Brown,* Brown was the beneficiary and executor of his parents' estates; the Commissioner mailed him a notice of deficiency alleging that these estates had terminated for income tax purposes. Following this notice, Brown petitioned the Texas Probate Court for an order directing that the estates needed ongoing management and administration. In a nonadversarial proceeding, in which the United States was not a party, the Probate Court entered an order authorizing Brown to continue managing the estates' assets until he determined unilaterally that the estates should be terminated. Brown later argued that this order was binding on both the Commissioner and the Federal trial court. *Id.* at 1333, 1341.

The Court of Appeals for the Fifth Circuit rejected Brown's argument. In so doing, the court stated that "The relevance of a state court's judgment to the resolution of a federal tax question will vary, depending on the particular tax statute involved as well as the nature of the state proceeding that produced the judgment." *Id.* at 1342. The court then observed that: (1) The Commissioner's notice of deficiency was issued before Brown petitioned the Texas Probate Court, (2) the United States was not a party in the probate proceeding, (3) the probate proceeding was nonadversarial, (4) Brown and the putative remaindermen were in agreement; thus, the Probate Court was not presented with all the relevant facts and differing views, and (5) the probate proceeding did not involve Texas State interests. *Id.* The court concluded that the Probate Court's order was entitled to little deference, adding that "Not only was there no genuine controversy involved, the Probate Court's order was unnecessary under the Texas Probate Code provisions relating to independent administrations." *Id.*

Most recently, in *Estate of Warren v. Commissioner,* 981 F.2d 776 (5th Cir. 1993), revg. and remanding 93 T.C. 694 (1989), the Court of Appeals for the Fifth Circuit applied *Estate of Bosch* in an estate tax case. In *Estate of Warren,* the proper construction of a will was in dispute in the Texas Probate Court. The parties in the dispute agreed ultimately to settle their dispute; the Probate Court modified and approved the settlement, and entered an agreed final judgment. Subsequently, respondent asserted an estate tax deficiency against the estate, and based her determination on a position that differed from a provision of the Probate Court's final judgment. Following a petition to this Court, we agreed with respondent; in so doing, we determined that, under *Commissioner v. Estate of Bosch,* 387 U.S. 456 (1967), we were not bound by the Probate Court's final judgment. The Court of Appeals for the Fifth Circuit disagreed; in reversing our decision, the court stated that:

The record as a whole affirmatively demonstrates that the dispute was a truly adversarial, nontax one and that the parties reached an arms-length and bona fide settlement of that dispute that was essentially approved by the Probate Court, and that what the Charities received in the settlement and under the Probate Court judgment accrued to them by virtue and as a result of the bequest to them in Article V of the will. There is no substantial evidence in the record to sustain a contrary finding. * * * [*Estate of Warren v. Commissioner,* 981 F.2d 776, 784 (5th Cir. 1993), revg. and remanding 93 T.C. 694 (1989); emphasis added.]

Applying this trilogy of cases to the instant case, we are not persuaded that petitioners should prevail. First, we note that res judicata or collateral estoppel does not apply to this case; respondent was not a party to the lawsuit that resulted in the final judgment.[21] *Commissioner v. Estate of Bosch,* 387 U.S. 456, 463 (1967). In addition, the State trial court's decision is not the decision of the State's highest court; thus, the trial court's determination of State law is not per se conclusive of the determination of State law for Federal income tax purposes. *Id.* at 465. Notwithstanding that the State trial court's decision is not conclusive on State law, however, this Court will give "proper regard" to that court's interpretation of its State's substantive law. *Id.* at 465; accord *Estate of Hubert v. Commissioner,* 101 T.C. 314 (1993) (in considering

_____

[21] Respondent also was not a party to the settlement discussions of petitioners and bank, or to the preparation of the allocation that was embodied in the final judgment.

an agreement settling a will contest in a State court proceeding, the Court reasoned that it was not required to give conclusive effect to the agreement under *Estate of Bosch;* the weight given to the settlement agreement was determined by the adversarial or nonadversarial nature of the State court proceeding). To this end, however, Judge Evins did not make an independent review of the allocation of the amounts in the final judgment. While the parties were adversarial with respect to the dollar amount contained in the final judgment, they were not adversarial on the issue of the allocation memoralized therein.

Second, petitioners' preparation of the final agreement was one-sided, and the final agreement was not the product of bona fide adversarial negotiations. Although the record shows that the State court proceedings between petitioners and bank were hotly contested and adversarial, the record also shows that the preparation of the final judgment was uncontested and nonadversarial. Accordingly, the State court was not presented with all the relevant facts and differing views with respect to the settlement agreement or final judgment before Judge Evins signed the final judgment and entered it accordingly.

Third, petitioners have not demonstrated how the terms contained in the final settlement affected State interests, or whether State interests would have been disrupted if the final agreement was drafted differently. Given that the State of Texas does not have a State personal income tax, see generally 1 State Tax Guide (CCH) 1502 (2d ed. 1993), we are hard pressed to find a State interest that would have been affected by a contrary allocation in the final judgment. We find relevant the following statement by the Court of Appeals for the Fifth Circuit in *Brown v. United States,* 890 F.2d 1329, 1342 (5th Cir. 1989): "the natural tendency of a busy [State] court is to accede to a proposed order without great deliberation when all known interested parties are in agreement and when state interests are not adversely affected."

In conclusion, the record shows affirmatively that the allocation in the final agreement was not a bona fide allocation that was reached at arm's length between petitioners and bank. The record also shows affirmatively that the allocation stemmed from the nonadversarial and uncontested preparation of the final judgment by petitioners, that they

were tax motivated in making the allocation, and that they considered the allocation to be a starting point in their anticipated future discussions with the Government over their 1987 Federal income tax liability.[22] Accordingly, we refuse to treat the allocation in the final judgment as determinative of the matter before us.

## 3. *Method of Allocation*

The factual setting of the case at hand involves claims of both tort and breach of contract; the settlement proceeds must be apportioned between these two types of claims in order to determine the amount of the proceeds that are attributable to a tortlike personal injury and excludable under section 104(a)(2). Having rejected the allocation in the final judgment, we now proceed to determine the correct allocation.

We believe that the settlement proceeds should be allocated based on the relationship of certain amounts included in the judgment entering the jury verdict of May 20, 1987. The jury returned its verdict following a long and strenuous trial. Before reaching its verdict, the jury was instructed by Judge Evins on the relevant laws of Texas to be applied to the facts of the case. We believe that the jury verdict had a direct bearing on the bank's settlement payment to petitioners and should be taken into account in our apportionment of that settlement.

With respect to the punitive damages awarded by the jury, however, we believe that a slight modification is necessary for present purposes. Petitioners' counsel in the settlement discussions informed them that the punitive damages of $50 million were the result of a "runaway jury" and were likely to be reduced or eliminated upon appeal. We believe that petitioners and bank both anticipated a significant reduction in the punitive damage award in the event of appeal, and agreed to the terms of the settlement agreement with this in mind. Accordingly, we first allocate the $10 million settlement payment (exclusive of the amount of the release) to the

---

[22] The unreliability of the final agreement is detected quickly from the provision granting $4,750,000 in damages for past mental anguish suffered by Edward Robinson. Assuming arguendo that the jury verdict included punitive damages for Edward Robinson's mental anguish equal to those requested by petitioners (i.e., five times actual damages), the jury verdict would have included only $1,500,000 for Edward Robinson's past mental anguish.

jury's award of contract and tort damages; afterwards, we allocate the remaining balance of the $10 million payment to punitive damages.[23]

Before allocating the $10 million payment among these components, we must first determine the amount of prejudgment interest that is included therein. The State trial court found that petitioners were entitled to $881,919.61 in prejudgment interest on the $59,260,000 jury verdict. Thus, based on this finding by the State trial court, we find that $146,640 of the $10 million payment to petitioners was prejudgment interest.[24] Accordingly, for purposes of our allocation, the "principal portion" of the settlement payment (exclusive of the amount of the release) is reduced to $9,853,360. To summarize, the $10 million settlement payment is allocated as follows:

|  | Damages | Percentage of damages |
| --- | --- | --- |
| Actual damages: | | |
| Lost profits | $6,000,000 | 60.893 |
| Other business damages | 175,000 | 1.776 |
| Injury to credit reputations | 85,000 | .863 |
| Mental anguish | 1,500,000 | 15.223 |
| Punitive damages | 2,093,360 | 21.245 |
| Settlement less prejudgment interest | 9,853,360 | 100.000 |
| Prejudgment interest | 146,640 | |
| Total settlement payment | 10,000,000 | |

As mentioned above, damages for tortlike personal injuries include punitive damages, damages for mental anguish, and damages for injury to reputation. In the case at hand, these three elements aggregate 37.331 percent of the damage award (i.e., 21.245+15.223+.863). Accordingly, petitioners

---

[23] We allocate no portion of the settlement payment to attorney's fees for the reasons stated *supra* note 15.

[24] We have determined the prejudgment interest of $146,640 by deducing that (1) the prejudgment interest included in the $10 million payment, divided by (2) the $10 million payment less the amount of prejudgment interest included therein, is the same ratio as (1) the prejudgment interest awarded by the State trial court on the jury verdict, divided by (2) the jury verdict. In other words, mathematically speaking, assuming that the prejudgment interest included in the $10 million payment equals "x", the ratio is as follows:

$$\frac{x}{10,000,000 \ - \ x} \ = \ \frac{881,919.61}{59,260,000.00}$$

may exclude 37.331 percent of the settlement payment from their gross income under section 104(a)(2); the balance of the payment is includable in petitioners' taxable income, section 61(a). In other words, petitioners' excludable portion of the settlement payment equals $1,787,599.30; i.e., 37.331 percent of the net payment (less prejudgment interest) of $4,788,511.72; the balance of the net payment (including prejudgment interest), $3,147,552.42, is includable in petitioners' 1987 gross income.

### 4. Bank's Release of Judgment Against Petitioners

In connection with the settlement of their lawsuit against bank, petitioners were released from bank's judgment against them in the amount of $691,972.43. As mentioned above, this judgment consisted of the $578,759.08 deficiency on the nonjudicial foreclosure sale of the business property, $55,337.44 in interest from the date of foreclosure to the date of judgment, and $57,875.91 for attorney's fees.

The parties agree that the portion of this release that is attributable to other than tortlike personal injuries is additional settlement proceeds that are includable in petitioners' gross income. See *supra* note 16. Hence, respondent has met her burden of proving $433,652.20 of the increase in the deficiency asserted in her amended answer. Rule 142(a); *Estate of Bowers v. Commissioner,* 94 T.C. 582, 595 (1990). Stated differently, we require that petitioners include in their 1987 gross income the full amount of the release ($691,972.43), less the 37.331 percent portion that is attributable to tortlike personal injuries.

The parties also agree that petitioners may deduct the other than tortlike personal injury portions of the following amounts related to these additional settlement proceeds: (1) Interest of $55,337.44 and (2) attorney's fees of $57,875.91. See *supra* note 16. Hence, we allow petitioners to deduct $70,949.67 in 1987; i.e., 62.669 percent of the sum of these agreed amounts.

Notwithstanding these expenses for interest and attorney's fees, petitioners contend that they may deduct other expenses that would have been deductible had they actually paid the $578,759.08 deficiency. We reject this contention. Although petitioners may have been able to deduct additional

expenses had they paid them, petitioners failed to prove at trial that they were entitled to any deductions in connection with the release, other than a portion of the interest expense of $55,337.44 and of the attorney's fees of $57,875.91 conceded by respondent.

We have considered all other arguments by the parties, and find them to be without merit.

For the foregoing reasons,

*Decision will be entered under Rule 155.*