T.C. Memo. 2003-82


UNITED STATES TAX COURT


RALPH W. EMERSON AND SUZANNE O. EMERSON, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 5877-00.                    Filed March 20, 2003.


<u>Thomas Casazza</u>, for petitioners.

<u>Margaret A. Martin</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


COHEN, <u>Judge</u>:  Respondent determined a deficiency of $34,956 in petitioners' Federal income tax for 1998 and a penalty of $6,991.20 under section 6662(a).  The issues for decision are: (1) Whether $90,684 petitioners received from settlement of a lawsuit is excludable from income under section 104(a)(2); (2) whether the settlement amount is subject to self-employment

tax; and (3) whether petitioners are liable for an accuracy-related penalty under section 6662(a).

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue.

FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference.

Petitioners resided in Davis, California, at the time they filed their petition in this case.

Ralph W. Emerson (petitioner) received an undergraduate degree from the University of California at Los Angeles, studying neurobiology, mathematics, and chemistry. He then attended graduate school at Harvard University, studying informational systems and chemistry. Prior to 1998, petitioner was a research biologist engaged in the business of developing pesticides, fungicides, and other agricultural products. Petitioner has attained about 14 patents from the U.S. Patent Office dealing with chemistries and biologies of biochemical pesticides and about twice that amount in international patents.

Petitioner's Relationship with ProGuard

On June 26, 1994, petitioner entered into a contract for services (the contract) with ProGuard, Inc. (ProGuard), to perform scientific research as an independent contractor. Petitioner and ProGuard shared an interest in developing "safer

chemistries" to be used on food supplies.  Petitioner's duties included developing pesticides for sale and developing intellectual property patents to protect the pesticides developed.  Under the contract, ProGuard paid to petitioner $10,000 per month as compensation for these services.  The contract provided that petitioner was entitled to 15 percent of the net profits of products sold by ProGuard as a result of his developments for the company.  The contract provided for the treatment of proprietary rights of the parties as follows:

New Developments

7.01    Emerson agrees that all designs, plans, reports, specifications, drawings, inventions, processes, and other information or items produced by Emerson while performing services under this agreement will be assigned to ProGuard as the sole and exclusive property of ProGuard and ProGuard's assigns, nominees, and successors, as will any copyrights, patents, or trademarks obtained by Emerson while performing services under this agreement.  On request and at ProGuard's expense, Emerson agrees to help ProGuard obtain patents and copyrights for any new developments. This includes providing data, plans, specifications, descriptions, documentation, and other information, as well as assisting ProGuard in completing any required application or registration.  ProGuard shall become the registrant of all products, shall acquire title to all patents and right to such products and shall produce, package and sell all products.

Successful "Start-Up" Phase

7.01(a)    If and when the "start-up" phase is deemed by ProGuard to be successful and of sufficient size to warrant its own identity, a new identity may be formed which would handle the sales and marketing of the "start-up" products.  The parties' respective interests in the new entity shall be based on capital invested with Emerson owning 15% [capital interest] and

ProGuard owning 85%. If additional capital is required, equity interest shall be based on partners' capital balance. ProGuard will have a right of first refusal should Emerson decide to sell his respective interest.

While at ProGuard, petitioner reported to Bradford G. Crandall, Sr. (Crandall, Sr.). Crandall, Sr. lent to petitioner over time $128,424.60, and promissory notes were created to document the loans (the loans).

Petitioner was diagnosed with diabetes in about 1990. During petitioner's relationship with ProGuard, he took daily medication for his diabetic condition. Petitioner ceased working for ProGuard on or about August 18, 1997.

Lawsuit Against ProGuard

On September 11, 1997, petitioner filed a complaint against ProGuard, Crandall, Sr., Bradford G. Crandall, Jr. (Crandall, Jr.), and a group referred to as "Does 1 though 50" (collectively, "defendants") in the Superior Court for the State of California for the County of Solano (the lawsuit). The complaint alleged that petitioner and Crandall, Jr. together obtained patents for products developed by petitioner while working with ProGuard. The patents were held in ProGuard's name, which would then package and sell the products. In consideration for petitioner's work, he was to receive 15 percent of the net profits from the sale of the products and a 15-percent capital interest in any entity formed by ProGuard and petitioner to sell

and market the products.  The complaint also discussed the loans made by ProGuard to petitioner.  Petitioner alleged that he "reasonably believed" that the loans represented advances of future compensation to be paid to him rather than a decrease in his expected capital interest.

The complaint referred to a document titled "Amendment to Contract for Services dated June 26, 1994 and Secured Promissory Note" signed in June 1997 (June 1997 agreement).  Petitioner additionally alleged that, in the June 1997 agreement, ProGuard loaned to him a final amount of $10,174.72 and, in consideration of this loan, petitioner waived any interest in a future startup entity formed by petitioner and the defendants.

After raising the general allegations regarding the contract and the June 1997 agreement, the complaint raised several causes of action including:  (1) Rescission based on undue influence; (2) rescission based on fraud and false promises; (3) breach of contract; (4) breach of covenant of good faith and fair dealing; (5) declaratory relief; (6) slander; (7) constructive trust; (8) quantum meruit; (9) conspiracy; (10) intentional infliction of emotional distress; and (11) injunctive relief.

On October 2, 1997, petitioner filed a first amended complaint in the lawsuit.  The amended complaint added reformation based on unconscionability, fraud, and unilateral

mistake as additional causes of action.  In total, the amended complaint raised 16 separate causes of action.

The defendants filed their answer and a cross-complaint on December 23, 1997.  The cross-complaint alleged breach of contract, conversion, and breach of covenant of good faith and fair dealing as causes of action against petitioner.  Petitioner filed a status conference report on January 2, 1998, stating that the nature of the case was in contract and tort.  Petitioner filed a second status conference report on March 5, 1998, and included a statement of the nature of the case as rescission or reformation of written contracts, breach of covenant of good faith and fair dealing, declaratory relief, quantum meruit, slander per se, constructive trust, conspiracy, intentional infliction of emotional stress, and injunctive relief. Petitioner filed an answer to the defendants' cross-complaint on March 6, 1998.

Settlement of the Lawsuit

In March 1998, retired California State Superior Court Judge Richard Gilbert conducted a mediation with the parties.  In attendance at the mediation were petitioner, petitioner's counsel Thomas Casazza, petitioner's accountant Robert K. Stevenson (Stevenson), the defendants, and their counsel Gregory Dyer (Dyer).  Judge Gilbert suggested during the mediation that petitioner add a personal injury claim to the suit as a vehicle

to reach settlement. After the mediation, there were several telephone conversations, facsimile exchanges, and correspondence among Judge Gilbert and counsel for both parties regarding the specifics of the settlement.

On July 21, 1998, petitioner's counsel sent to the defendants' counsel a package including the settlement agreement, a stipulation to amend the complaint, a second amended complaint, and a signed dismissal for both the complaint and the cross-complaint. Petitioner's counsel included a cover letter to this package stating:

> Per our discussion a couple of months ago, we are simply amending the complaint prior to dismissal to comply with accounting advice we have received. It has no operative effect whatever on the settlement.
>
> You can forward the dismissals to the Clerk with the instructions to enter the dismissals after the stipulation is signed and the amended complaint is filed * * *

The settlement agreement was signed by petitioner on July 20, 1998, and by the defendants on August 6, 1998. The other three documents in the settlement package were dated in July 1998, but were not received by the court until October 13, 1998.

The settlement agreement referred to the complaint and the two amended complaints by stating that petitioner sought damages for breach of contract and several causes of action including infliction of emotional distress and personal injury. The

settlement agreement stated that ProGuard would pay to petitioner $65,000 with additional amounts to be paid beginning 1 year from the settlement. In addition, the settlement agreement provided that ProGuard was to forgive, in equal amounts over 5 years, the $128,424.60 that was owed by petitioner. The $65,000 cash payment and $25,684.92 of debt forgiveness that was received by petitioner in 1998 are referred to as the settlement amount. At the time of settlement, the defendants did not report a personal injury claim to their insurance company to cover the cost.

On October 13, 1998, petitioner and the defendants filed a stipulation, permitting petitioner to file a second amended complaint. Simultaneously, petitioner filed the second amended complaint adding a cause of action for negligence. The negligence cause of action claimed that the defendants owed to petitioner a duty of care as "not to exacerbate" petitioner's diabetic condition. Petitioner claimed that the defendants created "intolerably stressful working conditions" by harassing petitioner while he was working, inducing him to work long days, threatening to terminate his employment, and threatening to reduce petitioner's capital interest. Petitioner alleged that this stress exacerbated his diabetic condition resulting in a "deterioration in his overall health and a reduction in his life expectancy".

Four minutes after petitioner filed the second amended complaint, the parties filed a request for dismissal, which the court entered the same day.

Federal Tax Return

Petitioners filed their Federal income tax return for 1998, reporting taxable income of $108,004.08 and tax of $24,907. Petitioners reported wages paid to petitioner of $141,000 from Summus Group, Ltd., shown on a W-2, Wage and Tax Statement. Petitioners received a Form 1099-MISC, Miscellaneous Income, from ProGuard for $90,684.92 of nonemployee compensation. When preparing petitioners' return, Stevenson was told that the lawsuit settled after the parties agreed that a claim for personal injury could be added by petitioner and that the payment was made based on physical injury. Stevenson did not review the entire second amended complaint or the other two complaints prior to preparing petitioners' return.

Petitioners included an attachment to their return, with a copy of the Form 1099, stating that the $90,684.92 was "excludable from taxpayer's taxable income pursuant to section 104(a)(2)" and was therefore not reported on their return as income.

OPINION

Settlement Proceeds

Respondent determined that petitioners are not entitled to exclude the settlement amount from income because it was not received on account of any personal physical injury or physical sickness.  Petitioners contend that the settlement payments are excludable under section 104(a)(2) because they were received on account of petitioner's physical injury.  Specifically, petitioners argue that the "lawsuit was settled only after there was a specific agreement to allow an amendment to petitioner's complaint to include a claim for physical injury, and that the reason the case was able to settle was because a payment was going to be made and received on that basis."

In this case, petitioners have neither argued that section 7491 is applicable to shift the burden of proof to respondent nor established that they complied with the requirements of section 7491(a)(2)(A) and (B).  The resolution of this issue does not depend on which party has the burden of proof.  We resolve this issue on the preponderance of the evidence in the record.

Section 61(a) includes in gross income "all income from whatever source derived" unless otherwise provided.  Section 104(a)(2), however, excludes from gross income "the amount of any damages (other than punitive damages) received (whether by suit or agreement and whether as lump sums or as periodic payments) on

account of personal physical injuries or physical sickness". Amounts are excludable from gross income only when (1) the underlying cause of action giving rise to the recovery is based on tort or tort-type rights and (2) the damages were received on account of personal injuries or sickness. Commissioner v. Schleier, 515 U.S. 323, 336-337 (1995); sec. 1.104-1(c), Income Tax Regs. Damages are not excludable from gross income under section 104(a)(2) if the damages are received pursuant to the settlement of economic rights arising out of a contract. See Robinson v. Commissioner, 102 T.C. 116, 126 (1994), affd. in part, revd. in part on another ground 70 F.3d 34 (5th Cir. 1995); see also Fono v. Commissioner, 79 T.C. 680, 692 (1982), affd. without published opinion 749 F.2d 37 (9th Cir. 1984).

If damages are received pursuant to a settlement agreement, the nature of the claim that was the actual basis for settlement, rather than the validity of the claim, determines whether the damages were received on account of tortlike personal injuries. See Robinson v. Commissioner, supra at 126. The determination of the nature of the claim is made by reference to the settlement agreement in light of the surrounding circumstances. Id. A key question to ask is: "In lieu of what were the damages awarded?" Id. (quoting Raytheon Prod. Corp. v. Commissioner, 144 F.2d 110, 113 (1st Cir. 1944), affg. 1 T.C. 952 (1943)). If the settlement agreement does not expressly allocate the settlement between

tort-type personal injury damages and other damages, an important factor in determining the validity of the agreement is the intent of the payor. Id. at 127.

In this case, the settlement agreement does not allocate the payment among the separate causes of action, so the nature of the claim must be determined by looking at the facts and circumstances surrounding the case and the intent of the payor.

Settlement Agreement and Underlying Complaints

Petitioner first alleged a claim for personal injury in the second amended complaint, which was filed with the court the same day as the dismissal. The second amended complaint alleged harassment and threats by the defendants and long working hours. Petitioner's testimony at trial of this case was different. Petitioner testified that he suffered physical injuries because of poor laboratory conditions and exposure to toxins while working for ProGuard and that these conditions harmed his deteriorating health. Petitioner testified in response to questions from his counsel:

> Q     Did you suffer physical injury because of the conditions in the laboratory of ProGuard?

> A     I assume that I did, breathing in the solvents, and the active ingredients that, you know, that kill aphid, and spider mite, and various fungi.

> *     *     *     *     *     *     *

> Q     Dean Emerson, do you know personally why you suffered physical injury while you were working at ProGuard?

A       Yes.

Q       And what was that?

A       I think it was working under the conditions
that were present in the work environment which were a
physical situation with laboratories, preparations of
materials without the best of good laboratory
practices, and the mental attitude, the gestalt that
went with that.

Petitioner did not, however, raise the issue of the poor laboratory conditions and exposure to toxins until the time of trial of this case in May 2002, when petitioner's counsel attempted to introduce expert evidence to demonstrate the risk associated with working with the chemicals to which petitioner was exposed.  Petitioner's sole tort claims prior to the second amended complaint consisted of slander and intentional infliction of emotional distress, neither of which qualifies for exclusion under section 104(a)(2).

At trial, when petitioner's counsel questioned petitioner as to why the defendants paid him the settlement money when the products he developed had not yet made it to market, petitioner responded that the money was paid for "positive results" and the gamble taken in gaining the patents.  Petitioner then responded to leading questions from his counsel that he received the money for a medical settlement for the deterioration of his health. The totality of petitioner's testimony suggests that he settled the case with the defendants based on the uncertainty of

litigation and questionable prospects for recovery on his contract claims.

In a similar situation, the taxpayers in Fono v. Commissioner, supra at 698-699, initiated litigation because of their disappointment with a contract under which they expected to receive over $1 million. The taxpayers requested the allocation in the settlement agreement to include personal injury to avoid taxation on the amount. The defendants in Fono adamantly refused to make such an allocation and did not recognize any liability in tort. In recognizing the economic realities of the litigation, this Court held that the entire amount was taxable.

Personal injury was 1 of 10 causes of action referred to in the settlement agreement and 1 of 17 causes of action in the second amended complaint. The mere mention of a physical injury in a complaint does not, by itself, serve to exclude the recovery of gross income under section 104(a)(2). Petitioners argue that the settlement was finalized based on the stipulation between the parties to allow the second amended complaint to be filed, adding a claim for personal injury. This agreement is insufficient to meet the requirements under section 104(a)(2). The settlement agreement and the second amended complaint together do not show that the actual basis of settlement was on account of personal injury. In fact, petitioner's counsel admitted in his cover letter to the defendants' counsel that the second amended

complaint had "no operative effect whatever on the settlement."
Even if we were to conclude that petitioner's claim for personal
injury was valid, the settlement agreement did not specifically
allocate any of the payment towards settlement of that particular
claim.

Intent of the Payor

Crandall, Jr. testified that the defendants had two reasons
for settling the case. First, they wanted to have clear title on
the patents. Second, they were afraid that, if they were tied up
in litigation for a period of time, they would lose their
"marketing opportunity". Crandall, Jr. further testified that
their "main objective in settling this case, our main reason to
settle this was not over a personal injury. It was to make clear
the intellectual property that we wanted so that we could go to
market and make money." The defendants' counsel, Dyer, also
testified similarly that the mediation and settlement were to
transfer clearly all rights in the patents to ProGuard.
Crandall, Jr. testified that the entire mediation discussion
revolved around the contractual dispute and there was no mention
of a claim for personal injury. See Dickerson v. Commissioner,
T.C. Memo. 2001-53 (no evidence of personal injury discussed in
negotiations); Coblenz v. Commissioner, T.C. Memo. 2000-131 (no
discussion regarding tort claim during final settlement).

In Robinson v. Commissioner, 102 T.C. at 123-124, the parties entered into a settlement agreement that did not contain an allocation, but they included an allocation in the final judgment. The judge approved the judgment which allocated 95 percent of the settlement amount to a personal injury claim solely to minimize the tax liability. This Court refused to accept the allocation in the final judgment stating:

> Petitioners therefore desired, and were given, the unfettered discretion to allocate the settlement proceeds in any manner they desired in order to minimize their Federal income tax liability. We find that petitioners deliberately and unilaterally arrived at the allocations contained in the final judgment solely with a view to Federal income taxes, and not to reflect the realities of their settlement. [Id. at 129.]

In Robinson, the Court concluded that the defendant did not intend to settle one claim to the exclusion of another. Similarly, in this case, the defendants solely intended to dispose of the case and secure their proprietary interests, and they did not object to petitioner's attempt to structure the settlement to satisfy his tax goals. The defendants' counsel testified that how petitioner structured the pleadings was his "problem" once the settlement amount was agreed to and the proprietary interests were secure.

As to petitioner's belated claim for personal physical injury, the "courts have not looked with favor upon retroactive revisions of written instruments * * * as a ground for

determining tax liabilities." Fono v. Commissioner, supra at 695. The allocation in this case is indistinguishable from numerous cases denying such retroactive tax planning. See Robinson v. Commissioner, supra at 133-134; Banks v. Commissioner, T.C. Memo. 2001-48; Burditt v. Commissioner, T.C. Memo. 1999-117. When the allocation language sought by a taxpayer is entirely tax motivated and does not reflect the economic realities of the settlement, the Court refuses to accept the characterization made by only one of the parties to the suit.

Based on the record, we cannot hold that the settlement amount or any part of it was paid on account of personal injury. The record compels the conclusion that the reference to personal injuries in the settlement documents was an afterthought, solely in anticipation of tax benefits, and did not reflect the nature of the claim by petitioner against ProGuard. We therefore hold that the entire settlement amount is includable in petitioners' gross income.

Self-Employment Tax

Respondent contends that the entire settlement amount, including the cancellation of indebtedness, is subject to self-employment tax under section 1401 because the amount received was compensation for services under petitioner's employment contract. Respondent claims that the defendants could have paid to petitioner an increased cash amount, with which petitioner could

have repaid his debt, and that increased amount would be subject to self-employment tax. Petitioners argue that petitioner's activities in the litigation do not meet the criteria of section 1401 requiring an active trade or business.

Section 1401(a) imposes a tax on self-employment income consisting of the earnings of a trade or business carried on by the individual. See sec. 1402(a) and (b). An individual is engaged in a trade or business if such individual's activities are conducted with continuity and regularity and primarily for income or profit. Sec. 1402(c).

Petitioner was an independent contractor engaged in the trade or business of research. The settlement amount he received was to settle a contract dispute and represented compensation for the research services he rendered to ProGuard as an independent contractor.

There is no reasonable dispute that the $65,000 cash payment was for petitioner's services and is subject to self-employment tax. Petitioner's complaint against ProGuard alleged that he "reasonably believed" that each of the loans from the defendants represented advances against future compensation. Thus the forgiveness of this debt also represented compensation to petitioner. Petitioners did not distinguish between the cash payment and the debt forgiveness on their return, during trial, or in their briefs. The total consideration received by

petitioner was compensation under the services contract and is subject to self-employment tax.

Accuracy-Related Penalty

Respondent contends that petitioners are liable for an accuracy-related penalty under section 6662(a). Respondent has the burden of production under section 7491(c) and must come forward with sufficient evidence that it is appropriate to impose the penalty. See Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001).

Under the narrow circumstances of this case, we hold that petitioners are not liable for the accuracy-related penalty. Petitioners relied on the suggestion of Judge Gilbert and on their attorney's advice to include a claim for personal injury. Petitioner accepted less in settlement of his claims than he hoped for, after a way to avoid tax on the proceeds was suggested by Judge Gilbert. Respondent does not contest the assertion that Judge Gilbert suggested the form of the settlement agreement. Petitioner was told that structuring the settlement to include a claim for personal injury would relieve him of his tax liability. Based on our review of the record, we conclude that petitioners are not liable for the accuracy-related penalty imposed under section 6662.

To reflect the foregoing,

Decision will be entered for respondent with respect to the deficiency and for petitioner with respect to the penalty.